IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 4, 2002 Session

## KLOSTERMAN DEVELOPMENT CORP. v. OUTLAW AIRCRAFT SALES, INC., ET AL.

**A Direct Appeal from the Chancery Court for Montgomery County**
**No. 99-06-0044     The Honorable James E. Walton, Judge**

_____

**No. M2001-02586-COA-R3-CV - Filed May 16, 2002**

_____

This case involves a contract for the sale of an aircraft. By amended complaint, plaintiff-purchaser sued seller and seller's agent for rescission of the contract and defendant-seller, by counter-claim, sought the amount due for repairs made on the aircraft pursuant to the contract. The trial court ordered the contract rescinded but failed to make provisions to put the parties in status quo. The purchaser, seller's agent, and seller appeal. We reverse the judgment of the trial court as it pertains to seller's agent, modify the judgment for rescission to include provisions of restoring the status quo of the parties. The judgment is affirmed as modified.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed In Part; Affirmed as Modified**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Charles C. Morrow, Nashville, For Appellant, Klosterman Development Corporation

Paige Waldrop Mills, Jody E. O'Brien, Nashville, For Appellees Outlaw Aircraft Sales, Inc. and David Cole

**OPINION**

On November 11, 1997, Steve Klosterman (hereinafter "Mr. Klosterman"), the president of the plaintiff, Klosterman Development Corporation, traveled to Clarksville, Tennessee in response to an advertisement in a national aviation publication known as Trade-A -Plane about a Cessna 421A for sale by the defendant, Outlaw Aircraft Sales, Inc. (hereinafter "Outlaw"), located in Clarksville, Tennessee. That same day, Mr. Klosterman signed a "Purchase Order" agreeing to purchase the Cessna 421A for $72,500.00 and paid $1000.00 as a down-payment or deposit. This purchase price did not include additional work such as required maintenance for the "annual" inspection necessary

for the aircraft to be licensed to fly, new paint, new interior and the repair and improvement of the aircraft's avionics. Mr. Robert Wyatt, president of Outlaw, also signed this "Purchase Order" which lists Mr. David Cole as the salesman for Outlaw and includes the following under the heading "Conditions of Sale": "Additional Items to be Approved." The back of this "Purchase Order" contains "Terms and Conditions" which provides in pertinent part:

> 3. The Purchaser hereby agrees that by and upon his taking physical possession of the aircraft he acknowledges that he has examined the aircraft and accepts it in the condition received unless otherwise noted on the reverse side hereof, and the Purchaser further acknowledges that the equipment list on the reverse side hereof is installed in the aircraft and that the equipment is accepted in the condition received unless otherwise noted.

> \* \* \*

> 6. It is further agreed that this Purchase order, when accepted by Seller, is the only contract controlling this sale and purchase and that it contains all agreements, expressed or implied either verbal or in writing, and Purchaser acknowledges receipt of a copy of the same.

Mr. Klosterman then applied for a loan in the amount of $80,000 through a Clarksville bank that Outlaw had previously used to finance aircrafts for its customers. Shortly thereafter, the loan officer, Mr. Bobby Freeman, informed Mr. Klosterman that his loan had been approved. The parties scheduled the closing of the sale of the aircraft for November 22, 1997.

On November 22, 1997, the parties executed another "Purchase Order" containing the original sale price of the airplane, $72,500.00, plus "added equipment" in the amount of $50,000.00 totaling $122,500.00. This "Purchase Order" was signed by Mr. Klosterman for plaintiff and Mr. Cole for defendant and contains the following under the heading "Conditions of Sale":

| | |
|---|---|
| Maintenance for Annual Inspection | $15,000.00 |
| New Paint | $10,500.00 |
| New Interior | $12,800.00 |
| Avionics Repair & Improvement | $11,700.00 |
| | -------------- |
| Total | $50,000.00 |

The back of this "Purchase Order" contains the same "Terms and Conditions" as the November 11, 1997, "Purchase Order" provided above.

Also, on November 22, 1997, the parties executed a document entitled "Duplicate Original - Aircraft Purchase Agreement" (hereinafter "Aircraft Purchase Agreement"). This document provides in pertinent part:

1. **AIRCRAFT**. SELLER AGREES TO SELL AND PURCHASER AGREES TO PURCHASE THAT CERTAIN AIRCRAFT (AIRCRAFT) GENERALLY DESCRIBED HEREIN BELOW AND MORE PARTICULARLY IN EXHIBIT A.

MANUFACTURER/YEAR: CESSNA 1969 SER.NO. 421A0032
MODEL: 421A          REG. NO.: N241A

2. **PURCHASE PRICE**. PURCHASER AGREES TO PAY AND SELLER AGREES TO ACCEPT THE TOTAL PURCHASE PRICE OF SEVENTY TWO THOUSAND FIVE HUNDRED ($72,500.00) U.S. DOLLARS PAYABLE AS FOLLOWS:

A. PURCHASER HAS MADE AN EARNEST MONEY DEPOSIT IN THE SUM OF ONE THOUSAND ($1,000.00) U.S. DOLLARS. EXCEPT AS PROVIDED IN SECTION 4 BELOW, THIS EARNEST MONEY DEPOSIT SHALL BE NONREFUNDABLE AND SHALL EITHER BE PAID TO SELLER OR APPLIED TO THE PURCHASE PRICE OF THE AIRCRAFT IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT.

B. BALANCE OF PURCHASE PRICE IN THE AMOUNT OF SEVENTY ONE THOUSAND FIVE HUNDRED ($71,500.00) U.S. DOLLARS PAYABLE UPON DELIVERY.

PURCHASER SHALL PAY ANY AND ALL DOCUMENTARY STAMPS, SALE/USE TAXES, DUTIES OR FEES ASSESSED OR LEVIED BY ANY FEDERAL, STATE, LOCAL, OR FOREIGN TAXING AUTHORITY AS A RESULT OF THE SALE, DELIVERY, REGISTRATION, OR OWNERSHIP OF THE AIRCRAFT. ALL PAYMENTS SHALL BE IN U.S. CURRENCY WITH GOOD AND COLLECTED FUNDS (BY MEANS OF CASH, CASHIERS OR OFFICIAL BANK CHECK OR WIRE TRANSFER).

\* \* \*

4. **ACCEPTANCE OF AIRCRAFT.** ON OR ABOUT <u>NOVEMBER 11, 1997</u> SELLER DELIVERED AIRCRAFT TO <u>CLARKSVILLE, TENNESSEE</u> WHERE PURCHASER CONDUCTED A PREPURCHASE INSPECTION TO VERIFY PROPER AIRCRAFT SYSTEM AND ENGINE(S) OPERATION, TO EXAMINE AIRCRAFT, ITS ENGINE(S), LOG BOOKS AND MAINTENANCE RECORDS. PURCHASER SHALL PAY FOR THE COST OF ITS PREPURCHASE INSPECTION. PURCHASER HAS CHOSEN TO PURCHASE THE AIRCRAFT IN ITS UNLICENSED CONDITION AND TO HAVE ALL IMPROVEMENTS, ANNUAL INSPECTION, REPAIRS, NEW PAINT AND NEW INTERIOR UNDER THE SUPERVISION AND CONSULTATION WITH OUTLAW AIRCRAFT SALES. ALL WORK WILL BE DONE AT AN ADDITIONAL EXPENSE TO THE PURCHASER.

5. **DELIVERY**. DELIVERY SHALL TAKE PLACE ON OR ABOUT <u>NOVEMBER 22, 1997</u>. DELIVERY SHALL BE AT <u>CLARKSVILLE, TENNESSEE</u>. COST OF DELIVERY SHALL BE AT PURCHASER'S EXPENSES (NOT LIMITED TO FUEL, AND AIRLINE FARE). AIRCRAFT WILL BE DELIVERED EQUIPPED AS INSPECTED, WITH LOG BOOKS, MAINTENANCE RECORDS, AND FLIGHT MANUALS OF AIRCRAFT. PURCHASER SHALL PAY TO SELLER THE FULL PURCHASE PRICE UPON DELIVERY. CONFIRMATION OF AIRCRAFT DELIVERY SHALL BE IN WRITING BY USE OF EXHIBIT C ATTACHED HERETO.

\* \* \*

10. **ENTIRE AGREEMENT**. THE TERMS AND CONDITIONS OF THIS AGREEMENT CONSTITUTE THE ENTIRE AGREEMENT OF THE PARTIES HERETO AND SUPERSEDES ALL PREVIOUS NEGOTIATIONS, REPRESENTATIONS, AND AGREEMENTS BETWEEN THE PARTIES. THIS AGREEMENT MAY NOT BE VARIED, AMENDED, OR SUPPLEMENTED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY BOTH THE PARTIES.

11. **DEFAULT**. IF PURCHASER SHALL DEFAULT UNDER THIS AGREEMENT, SELLER SHALL HAVE THE OPTION OF

SUING FOR DAMAGES, INCLUDING BUT NOT LIMITED TO, REASONABLE ATTORNEY'S FEES, OR, RESCINDING THIS AGREEMENT WHEREUPON ALL SUMS PAID HEREUNDER SHALL BE RETAINED BY SELLER AS LIQUIDATED DAMAGES.

Although defendant paid Outlaw $72,900.00[1] during the closing on November 22, 1997, he did not then take delivery of the aircraft. Outlaw agreed to supervise the necessary maintenance and improvements to be made on the aircraft which were listed in the November 22, 1997, "Purchase Order."

Thereafter, Mr. Klosterman received a facsimile document dated January 23, 1998, and signed by Mr. Cole which provides in pertinent part:

PLEASE CALL AND TELL ME TO PRESS FORWARD ON THE ANNUAL SINCE OUR SHOP HAS FREED UP ON THE TWO BIG PROJECTS THAT WERE AHEAD OF YOUR AIRCRAFT.

ALSO, SEND A PAYMENT ON THE ANNUAL ACCOUNT OF $5,000.00 MINIMUM PAYABLE TO AIRCRAFT MAINTENANCE, INC. WITHIN THE NEXT TEN DAYS. THIS WILL KEEP THINGS MOVING AS WELL.

I HAVE UPS YOU THE SQUAWK[2] LIST.

BEST REGARDS,
[Signature]
DAVID COLE

As instructed, Mr. Klosterman sent a check to Outlaw dated January 27, 1998, in the amount of $5,000.00 payable to Aircraft Maintenance, Inc. Shortly thereafter, Mr. Klosterman received another squawk list that was shipped on January 31, 1998 and dated November 25, 1997. This squawk list included approximately 128 items as opposed to the squawk list Mr. Klosterman received on November 22, 1997, which contained approximately 35 items.

---

[1]Mr. Freeman, the loan officer, had prepared the loan check in the amount of $72,900.00 instead of the correct balance of $71,500.00. This was an overpayment of $1400.00 which included Mr. Klosterman's $1000.00 down-payment or deposit and a $400.00 overpayment by the bank. Mr. Klosterman was entitled to a credit of $1400.00 to be applied towards the upcoming repairs and paint which, according to the "Aircraft Purchase Agreement", was to be done under Outlaw's supervision.

[2]A squawk list contains an aircraft's mechanical problems and is prepared by an aircraft mechanic.

Several months later, Mr. Klosterman received another facsimile document from Mr. Cole dated July 8, 1998, informing Mr. Klosterman that July 20, 1998, is the projected completion date for the annual maintenance and ten (10) items that were still outstanding. According to the record, after the annual maintenance was performed on the aircraft, Outlaw had originally planned on flying the aircraft to a company in Oklahoma for the painting and interior work. However, in July of 1998, Mr. Cole suggested to Mr. Klosterman that they use Custom Planes, Inc. (hereinafter "CPI"), located in Lawrenceville, Illinois, to perform the painting and interior work on the aircraft. Mr. Klosterman then traveled to CPI to discuss having the work done there and on August 1, 1998, Mr. Klosterman agreed to pay CPI $25,000 to paint the aircraft and install leather interior and a coffee maker. Mr. Klosterman paid $12,000.00 to CPI as a down-payment on the work.

On November 18, 1998, Mr. Robert O. Wyatt, the president of Outlaw, sent Barry Kemp, defendant's lawyer, a letter which provides in pertinent part:

> YOU SHOULD BE RECEIVING BY UPS THIS MORNING A COPY OF THE WORK ORDER ON N241A. THERE ARE 19 PAGES TO THIS WORK ORDER. MR. KLOSTERMAN HAS PAID $6,400.00 ON THIS WORK SO FAR. IF YOU NEED ANY EXPLANATION ON THE BREAK DOWN OR PARTS PLEASE LET US KNOW.
>
> MR. KLOSTERMAN NEEDS TO NOTIFY HIS INSURANCE COMPANY THAT WE ARE GOING TO MOVE THE AIRCRAFT AND MAKE SURE THE PILOT IS APPROVED FOR A FERRY FLIGHT.
>
> *    *    *
>
> WHEN THE AIRCRAFT PAINT AND INTERIOR ARE FINISHED WE WILL WEIGH THE AIRCRAFT AND COMPUTE THE CURRENT EQUIPMENT LIST AND WEIGHT AND BALANCE.

On November 27, 1998, Mr. Cole sent Mr. Klosterman a handwritten facsimile document providing in pertinent part:

> Robert [Wyatt] says the C-421 is ready to go to Paint Shop.
>
> Requested Pilot approval requirements from your Insurance Policy "Open Pilot Warranty Clause" or phone number.
>
> Call or fax Robert.

On December 21, 1998, Mr. Wyatt sent a letter to Mr. Klosterman which provides in pertinent part:

> PER YOUR REQUEST WE FEEL THAT N241A AS EQUIPPED AND THE TIMES SHOULD BRING BETWEEN $170,000.00 AND $180,000.00 WITH THE PURPOSED (sic) NEW PAINT AND INTERIOR.

On June 8, 1999, plaintiff filed a complaint against defendants, Outlaw Aircraft Sales, Inc. and David Cole, seeking damages and possession of the plane. The complaint provides in pertinent part:

IX

> Defendant Outlaw Aircraft Sales, Inc. had agreed to fly the plane to Customs Planes, Inc. for the paint job and other work after they had done the annual, therefore, the Plaintiff assumed that since the Defendant was doing the annual inspection on January 27, 1998 and six (6) months later called Plaintiff and told him to contact Customs Planes, Inc. for the other work (painting and interior) the plane was ready as far as the annual was concerned.

> Several weeks passed before Plaintiff heard anything further about the status of the extra work to be done on his plane. Then Plaintiff received several pages of a work order from the Defendant, alleging certain work done. However, the work on the plane was not completed, particularly the work to be done by Customs Planes, Inc., nor was the avionics repair or improvements done.

*    *    *

XI

> The invoices received show a total of over Sixty Thousand Dollars ($60,000.00), but the plane was not completed as agreed. The Plaintiff has been receiving monthly statements, the work stopped and the plane is sitting at Defendant's place of business.

> Defendant states that it has completed the annual and are (sic) ready to sign off the annual inspection and will fly the plan to Customs Planes, Inc., as previously agreed, but has not done so.

However, Defendant demands payment to them in the amount of Sixty-Six Thousand Two Hundred Nineteen Dollars ($66,219.10) before taking the plane to Customs Planes, Inc.

Defendant acknowledges that the annual has been completed, but no improvements on the avionics have been made and the exterior painting and new interior have not been done.

## XII

Since the biggest part of the extra work has not been done but the annual has been completed that render (sic) the plane airworthy, Plaintiff has offered to pay Defendant the balance that he owes Defendant for the annual inspection upon Defendant delivering the plane to Customs Planes, Inc., as agreed.

The agreed annual inspection and maintenance was for Fifteen Thousand Dollars ($15,000.00), although, at first Defendant gave Plaintiff an estimate of Three thousand Five Hundred dollars ($3,500.00) to do the annual.

Therefore, Plaintiff having paid Defendant Five Thousand Dollars on the annual by check #5347 dated January 27, 1998; having an overpayment of One Thousand Four Hundred Dollars ($1,400.00) due him, for a total of Six Thousand Four Hundred Dollars ($6,400.00) paid toward the agreed upon Fifteen Thousand Dollars ($15,000.00) for the annual; this leaves a balance of Eight Thousand Six Hundred ($8,600.00) the Plaintiff owes Defendant for the annual inspection to comply with the FAA annual requirement. Defendant refuses to comply, thus this action for recovery of his plane.

\*    \*    \*

## XIV

Defendant has completed all work necessary for the issuance of an FAA Certificate to certify that the annual inspection has been completed. This was to be done for Fifteen Thousand Dollars ($15,000.00). The Plaintiff is due a credit of Six Thousand Four Hundred Dollars ($6,400.00), thus the Plaintiff owes the Defendant Eight Thousand Six Hundred Dollars ($8,600.00) on the contract.

Giving Defendant credit of $8,600.00 against the 51,153.00 damages that Defendant owes Plaintiff, your Plaintiff is entitled to Forty-Two Thousand Two Hundred Fifty-Three Dollars ($42,253.00).

XV

As the Plaintiff has paid for the aircraft, he is entitled to immediate possession and request that this Court give the possession of his aircraft, requiring the Defendant so sign off on the annual inspection and the only issue to be determined by this Court is damages.

On July 15, 1999, Outlaw and Mr. Cole filed an answer and counterclaim. The answer denies the material allegations of the complaint and also includes an affirmative defense which states in pertinent part:

2. The document signed on November 22, 1997 ["Purchase Order"], and attached as Exhibit A to Plaintiff's Complaint is not a contract. All parties to this document were aware that it was merely a document executed at the bank's request to complete the bank's file. It was not intended by either party to be a binding contract for the needed maintenance on the plane at issue.

3. There was no meeting of the minds regarding the document signed on November 22, 1997, and attached as Exhibit A to Plaintiff's Complaint.

4. Alternatively, both parties were mutually mistaken regarding the meaning of the document attached as Exhibit A to Plaintiff's Complaint.

7. Plaintiff's sole and exclusive remedy for any breach is rescission of the Purchase Agreement and return of any sums paid.

The defendants' counterclaim avers that plaintiff breached the contract by failing to pay for the cost of the repairs made to the aircraft and seeks $67,022.76 in damages plus pre-judgment interest and attorney's fees. On August 25, 1999, plaintiff filed an answer to the defendant's counterclaim denying the material allegations thereof and praying that the counter-claim be dismissed.

In March, 2000, CPI filed for bankruptcy and at this time, the aircraft had not been delivered for paint and interior work by Outlaw.

On July 11, 2000, plaintiff, with leave of court, filed an amended complaint, which provides in pertinent part:

II

Section XIV of the Original Complaint is stricken and amended as follows:

Besides the Seventy-Two Thousand Five Hundred Dollars ($72,500.00) that Plaintiff paid the Defendant for the plane, Plaintiff has spent an additional Eighteen Thousand Four Hundred Dollars ($18,400.00) towards the Fifty Thousand Dollars ($50,000.00) that was included for the additional work to annual the plane and other improvements.

III

Section XV of the Original Complaint is hereby stricken and the following is inserted as amended:

The Plaintiff request (sic) the Court to declare the purchase agreement in default by the seller as the terms and conditions of the contract have not been complied with by the seller within over a two-(2) year period.

* * *

V

Wherefore, Plaintiff ask (sic) the Court for a judgment against the Defendant for Ninety Thousand Nine Hundred Dollars ($90,900.00) plus interest on the money that Plaintiff has paid out because of the default of the purchase agreement by the Defendant. Said itemization is a follows (sic):

| | |
|---|---|
| Cessna 421 Cost | $72,500.00 |
| Overpayment | 1,400.00 |
| Paid on Annual | 5,000.00 |
| Paid on painting & interior | 12,000.00 |
| | ------------- |
| TOTAL | $90,900.00 |

vi

-10-

Now, for an amendment on the Counter-claim, Plaintiff states as follows:

Since Plaintiff has asked for the recision (sic) of the purchase agreement of the plane (C-421) Defendant is receiving the plane back. Whatever additional work the Defendant may have done to said aircraft has enhanced its value and therefore Defendant will not suffer any loss. The recision (sic) by Plaintiff resulted in Defendants' negligence for failing to fulfill said purchase agreement within a reasonable time frame.

Wherefore, said counter-claim should be dismissed.

On July 19, 2000, defendants filed an answer to the amended complaint incorporating the original counterclaim. The answer also includes a motion to dismiss on behalf of Mr. Cole. The defendants' answer denies the material allegations set forth in the amended complaint and includes an affirmative defense which provides in pertinent part:

5. The document signed on November 22, 1997, and attached as Exhibit A to Plaintiff's original Complaint is not a contract. All parties to this document were aware that it was merely a document executed at the bank's request to complete the bank's file. It was not intended by either party to be a binding contract for the needed maintenance on the plane at issue.

6. There was no meeting of the minds regarding the document signed on November 22, 1997, and attached as Exhibit A to Plaintiff's Complaint.

7. Alternatively, both parties are mutually mistaken regarding the meaning of document attached as Exhibit A to Plaintiff's Complaint.

A nonjury trial was held on February 1 and 2, 2001. On July 12, 2001, the trial court filed its "Memorandum Opinion" which provides in pertinent part:

The plaintiff seeks rescission of a proposed contract to buy an airplane from the defendants. The defendants allege that they performed work on the aircraft valued at more than $86,000. The plaintiff denies that he, in any way, contracted to make these repairs to the aircraft and further alleges that the defendant committed to do the work for only $50,000.

The plaintiff visited Clarksville, TN., on November 11, 1997, for the purpose of inspecting the airplane. While there, the plaintiff signed a Purchase Order for the airplane setting a sales price of $72,500. In this Purchase Order, there was language concerning repairs, but the amounts were to be determined in the future. On November 19, 1997, the defendants notified the plaintiff that the additional expenses would be $50,000. The plaintiff called the defendants and talked with Mr. Cole. The plaintiff stated that they had not agreed on this figure and that it seemed high to him. The plaintiff alleges that Mr. Cole said that he (Cole) needed some room because repair costs were uncertain. The plaintiff then agreed to buy the aircraft for a total of $122,500, representing the original purchase order and the repairs.

From that point forward there was not a lot of communication between the parties. The main item of contention was the cost of the annual inspection and repair as required by the FFA (sic).

The plaintiff believes that the $50,000 expense figure he agreed to covered the costs of the annual. The defendants say that the $50,000 did not cover the costs of the annual and that they did not quote any figure to the plaintiff concerning the cost of the annual. The defendants presented testimony that it is not customary in the aircraft industry for there ever to be a quote given on the costs of an annual inspection and repair; the reason being, no one can tell what problem may exist with the engine or what the costs of repair will be until the engine is disassembled.

There is no doubt that the defendants made many repairs at great expense to this airplane, however, the evidence establishes by a preponderance that after the parties discussed and agreed upon repair expenses of $50,000, there was little contact between the parties. The plaintiff did not execute or give his permission or approval for the work done on the airplane. The parties had two separate ideas of what they had agreed to do. They had reached an agreement concerning the basis sales price of $72,500 and $50,000 in repairs. However, the plaintiff did not contract for or agree to the repairs made by the defendant. Considering all of the circumstances, there was not a meeting of the minds so as to constitute a contract.

The plaintiff has carried the burden of proof and the entire contract is set aside.

-12-

On August 13, 2001, the defendants filed a motion to alter or amend the judgment. On August 27, 2001, the trial court filed an order which provides:

> This matter came on to be heard before the Honorable James E. Walton, upon the Complaint filed by the plaintiff and the Counter-complaint of the defendants.
>
> IT IS ORDERED, ADJUDGED and DECREED by the Court as follows:
>
> 1. That the plaintiff has carried the burden of proof and the entire contract is set aside.
>
> 2. That the counter-complaint filed by the defendants is dismissed.
>
> 3. That the normal costs of this cause are to be divided equally.
>
> 4. That each party will bear their own discretionary costs.

The trial court's August 27, 2001 order was made final by order entered on September 20, 2001, dismissing any and all pending motions in this case.

The plaintiff, Klosterman Development Corporation, appeals and raises the following two (2) issues for review as stated in its brief:

> 1. The Honorable Trial Judge failed to find the total sum of money that the Appellant has paid under the contract.
>
> 2. The judge's final order failed to give Appellant a judgment of all sums paid by the Appellant under the contract that should be refunded to the Appellant, and, for post judgment interest and the beginning of it.

The defendants, Outlaw Aircraft Sales, Inc. and David Cole, have also filed a notice of appeal presenting the following four (4) issues for review as stated in their brief:

> 1. Whether the Chancery Court erred in awarding the Plaintiff/Appellant the extraordinary remedy of rescission.

-13-

2. Whether the Chancery Court erred in failing to grant Defendant Cole's Motion for Partial Summary Judgment and his Motion For A Directed Verdict at the close of Plaintiff's proof.

3. Whether the facts as stated by the Chancery Court are contrary to the preponderance of the evidence presented at trial, including:

> a) Whether the Chancery Court erred when it found that the document labeled Trial Exhibit No. 7, titled "Purchase Order" and dated November 22, 1997, was an agreement between the parties rather than a document prepared at the request of the Bank that financed the Plaintiff/Appellant's loan so that the Bank could justify loaning Plaintiff additional sums above and beyond the purchase price of the airplane.

> b) Whether the Chancery Court erred in finding that the repairs and maintenance that Defendants performed on the airplane were not authorized by the Plaintiff.

> c) Whether the Chancery Court erred in failing to grant Defendant/Appellee Outlaw Aircraft judgment in the amount of $88,272.82 for the repairs and maintenance Defendant Outlaw Aircraft has performed on the airplane plus all attorney fees incurred in collecting the amounts owed.

4. Whether Plaintiff's assertion in Appellant's Brief that he is entitled to reimbursement from Defendants for sums paid by Plaintiff to third parties is erroneous.

Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

We first address the defendants' issues 1 and 3(a).

The appellees, Outlaw and Mr. Cole, argue that the appellant, Klosterman Development Corporation, is not entitled to the remedy of rescission. We disagree. Although rescission is not favored in Tennessee, the law provides that rescission is available when there is a mutual mistake. In ***Robinson v. Brooks***, 577 S.W.2d 207 (Tenn. Ct. App. 1978), this Court stated:

Where parties have apparently entered into a contract evidenced by a writing, but owing to a mistake of their minds did not meet as to all the essential elements of the transaction, so that no real contract was made by them, then a court of equity will interpose to rescind and cancel the apparent contract as written, and to restore the parties to their former positions, the rule being the same whether the instrument relates to an executory agreement or to one which has been executed. Furthermore, equity will grant relief on the ground of mistake, not only when the mistake is expressly proved, but also when it is implied from the nature of the transaction. It is not essential that either party should have been guilty of fraud.

*Id*. at 208 (quoting 12 C.J.S. *Cancellation of Instruments* § 27 b (1)). The **Robinson** Court also provided the elements of mutual mistake necessary to authorize rescission:

In order to authorize relief for mistake the mistake generally must have been mutual, and it must have been material, and not due to the complainant's negligence; and complainant must show injury.

*Id*. at 209 (quoting 17A C.J.S. *Contracts* § 418(2)).

The equitable remedy of rescission is not enforceable as a matter of right but is a matter resting in the sound discretion of the trial court and the court should exercise the discretion sparingly. *Vakil v. Idnani*, 748 S.W.2d 196, 199 (Tenn. Ct. App. 1987)(citing *Early v. Street*, 241 S.W.2d 531 (Tenn. 1951); *McMillan v. American Suburban Corp.*, 188 S.W. 615 (Tenn. 1916)). Thus, the real question in the case before us is whether, under the proof, the trial court abused its discretion in rescinding the contract. We think not.

The proof is clear that the parties executed a document entitled "Purchase Order" on November 22, 1997. This document contained the purchase price of the aircraft, $72,500.00, plus "added equipment" in the form of "maintenance for annual inspection", "new paint", "new interior" and "avionics repair & improvement" in the amount of $50,000.00, as a "condition of sale".

It appears that both parties had a different understanding as to the meaning of the November 22, 1997, "Purchase Order". Mr. Klosterman testified that the November 22, 1997 "Purchase Order" contained the price of the airplane and included, as a condition of sale, a ceiling for the total cost of the repairs. Mr. Klosterman's testimony on direct examination is as follows:

Q. Now, let me hand you another document. Do you recognize that, Mr. Klosterman?

A. Yes. This is the purchase order for the airplane that I signed on November 22, 1997.

Q. All right. That shows the 75 percent of 72,5; doesn't it?

A. Yes, it does.

Q. That shows added equipment of $50,000; doesn't it?

A. That's correct.

Q. And over here on the left-hand side it says, "condition of sale," right?

A. Right.

Q. "Maintenance for annual inspection, $15,000?"

A. Correct.

Q. You have, "painting, 10,500?"

A. Correct.

Q. Let me back up. That $15,000 is a little bit more than what he [Mr. Cole] quoted you that it would probably cost to do the annual, didn't it?

A. Right, it was a lot more.

Q. And the 10,500 was more than he quoted you to do the painting, wasn't it?

A. Right.

Q. And "new interior, 12,800?"

A. Right.

Q. That's more than he quoted you, wasn't it?

A. Yes.

Q. And he [Mr. Cole] quoted you for avionics, $11,700?

A. Yes.

Q. What did you say then to Mr. Cole?

A. I said, "Dave, this isn't what we agreed on." I said, "this is a lot higher." And he says, "well, we just needed a little room and it won't exceed this amount. We just needed some room." And I said, "I think that's a lot of room." He said, "well, this is just a high price and it definitely won't exceed this."

Q. All right.

A. So I went ahead and signed it anyway.

Q. So $122,500, you still figured what?

A. I figured, worse case scenario, it would be 50,000, this airplane sale.

However, Mr. Cole testified that the November 22, 1997, "Purchase Order" was simply a document requested by Mr. Freeman, the loan officer, in order to make the loan to Mr. Klosterman. Mr. Cole's testimony on direct-examination is as follows:

Q. Just proceed, Mr. Cole, and tell us how that document came to be.

A. Well, Mr. Freeman said he needed a document for his banking records to justify his loan. And these are the figures that he gave us that we had the secretary type. And the secretary typed it and he used it in his closing.

Mr. Cole also testified on cross-examination:

Q. I'll ask you this: Did Mr. Freeman tell you without a contract, he would not make the loan?

A. That's correct.

* * *

Q. You and Mr. Freeman talked several times about this loan, didn't you?

A. We would have talked once or twice.

-17-

Q. Well, that's several times, twice, didn't you (sic)? And he came out to your place of business and you all discussed it in your office, didn't you?

A. Correct.

Q. Now, Mr. Freeman told us he got these figures from you, do you deny that? The figures that are on that contract – before the contract –

A. I can't testify to what Mr. Freeman says.

Q. Mr. Cole, I asked you. Mr. Freeman said he got these figures from your conversations with him; is that true?

A. Are you talking about these figures right here (indicating)?

Q. Yes.

A. No.

Q. He didn't get them from you?

A. He gave them to me.

Q. Why would he tell you how much it's going to cost to annual the airplane?

A. Well, for the reason that the bank need this –

* * *

Q. Why would he be telling you how much it's going to cost to annual the airplane?

A. He wasn't telling me how much it was going to cost. He was doing a bank document that he requested to be typed. He gave me the figures. I didn't see these figures until that day at closing.

The trial court also questioned Mr. Cole regarding his understanding of the November 22, 1997, "Purchase Order":

THE COURT: Mr. Cole, let me ask you something about that exhibit. When you signed Exhibit 7, what did you think this document was?

THE WITNESS: Purely a bank document. I could not sign for our company. Only Robert Wyatt could sign anything that was financial.

THE COURT: But you did sign for your company.

THE WITNESS: I signed that. What I understood for the bank, that's correct.

THE COURT: Now, Mr. Cole, the figures stated on here, the 15,000, the 10,5; 12,8; 11,7; was total $50,000. Are those figures right or wrong?

THE WITNESS: Those figures were just an outline or estimate provided to me by Bob Freeman, and I rounded them to what I thought made sense for a bank document.

THE COURT: So in your view, these figures had no meaning whatsoever?

THE WITNESS: That's correct. Except they were industry representative figures.

Similarly, Mr. Freeman, the loan officer, testified that the November 22, 1997, "Purchase Order" was a bank document that was generated so that Mr. Klosterman could borrow more money than the purchase price of the aircraft. We quote from the record:

Q. So to apply that to the case we have here, if he wanted to borrow $80,000, that had to be 75 percent of , at least 75 percent –

A. Of the retail value of the airplane.

Q. Now, how would you go about establishing that to meet your rules?

A. My bank rules were one of two rules; either an independent aircraft appraisal or a dealer's invoice.

Q. When you say a dealer's invoice or an appraisal, you're saying you had to have that documentation of what the retail value of the plane is?

A.  Yes.

Q.  Keep going.

A.  Now, after I learned Mr. Klosterman, that he wanted to borrow $80,000, he and I had several conversations about what I could do for him and what I couldn't do.  And he told me he wanted to borrow $80,000, and I said, okay, I'll see what I can do.

I went back to Dave Cole and I either learned Mr. Klosterman or from Dave Cole what the purchase price of the aircraft was.  And I also learned that Mr. Klosterman wanted some more work to be done.  And I got into some of the details of what that work was to be done and did my own appraisal for my own benefit to protect me and my bank as to the value of the aircraft.

I did my own appraisal, and I found out the aircraft was out of annual inspection which lowers the retail value.  I also found out that Mr. Klosterman, one of the things he wanted done or intended to have done at a later date was new paint, new interior, which raises the market value to some degree.

*   *   *

So once I learned what some of the things that were going be (sic) done, what I was trying to get at was, what does the retail value have to be for me to loan $80,000 on it.  So I looked up – we have a loan guide.  I looked up the loan guide what the average cost of the paint for that type aircraft was and what the average cost of the interior was and what the average cost of the annual inspection was.

*   *   *

Q.  So you were trying to calculate what this plane would be worth if these things on an average cost basis were done to the plane?

A.  Yes....

*   *   *

Q.  Now, after you came up with these figures, did you have another conversation with Dave Cole?

A.  Yes, sir.  When I came up with figures I had a conversation when I asked him to put it on an invoice form for me.

-20-

Q. And where was that done at?

A. Where was this document done?

Q. Yeah.

A. I guess the document was actually done by Mr. Wyatt's secretary.

Q. Now, these figures were just a guess you made, wasn't it?

A. Yes. An educated guess.

Q. Now, did you understand that document to be a contract between Outlaw Aviation, Outlaw Sales, and Mr. Klosterman?

A. No, sir.

Mr. Wyatt, the president of Outlaw, testified that it is not his practice to provide flat rate quotes. Mr. Wyatt testified on direct examination:

A. Working on an airplane is a very serious thing. And anybody, if you give a price, I want to use an example of $3,000, to do a job, and you get involved in it, there is the – it would only be human nature for a person to, if he found more wrong with it, to maybe not, maybe not fix everything. And I just don't do business that way. Either I, if my shop, if we do an inspection and we sign it off as airworthy, we fix it to the best of our knowledge or we don't do it.

Q. So in other words, it wouldn't be ethical in your opinion to give a flat rate on something like that because if you got in it and it was more involved, the tendency would be not to fix everything as well as it should be fixed, and that's not safe?

A. That's correct.

When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge, as the trier of fact, has the opportunity to observe the witnesses in their manner and demeanor while testifying and is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id*.; *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

The trial court accredited the testimony of Mr. Klosterman concerning the meaning of the November 22, 1997, "Purchase Order." Specifically, the trial court found that "[t]he parties had two separate ideas of what they had agreed to do. They had reached an agreement concerning the basis sales price of $72,500 and $50,000 in repairs. However, the plaintiff did not contract for or agree to the repairs made by the defendant. Considering all of the circumstances, there was not a meeting of the minds so as to constitute a contract."

It is well established in this jurisdiction that a contract can be expressed, implied, written, or oral, but an enforceable contract must result from a meeting of the minds in mutual assent to terms, must be based upon sufficient consideration, must be free from fraud or undue influence, not against public policy and must be sufficiently definite to be enforced. *See Anderson County v. Architectural Techniques Corporation*, 03A01-9303-CH-00110, 1993 WL 346473 at **4 (Tenn. Ct. App. Sept. 9, 1993)(citing *Johnson v. Central Nat'l Ins. Co.,* 356 S.W.2d 277 (Tenn. 1961)).

Tennessee law provides that rescission is not available if the parties cannot be placed in status quo. *See Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993). The appellees argue that they cannot be placed in status quo because they will be forced to sell the aircraft at a loss. Mr. Wyatt, the president of Outlaw, sent Mr. Klosterman a letter dated December 21, 1998, which provides in pertinent part:

> PER YOUR REQUEST WE FEEL THAT N241A AS EQUIPPED AND THE TIMES SHOULD BRING BETWEEN $170,000.00 AND $180,000.00 WITH THE PURPOSED (sic) NEW PAINT AND INTERIOR.

The defendants still have possession of the aircraft with all its improvements.

Accordingly, the trial court did not abuse its discretion in rescinding the contract and the evidence does not preponderate against the trial court's finding.

We will now address the defendants' second issue.

The defendants argue that the trial court erred in denying Mr. David Cole's motion for partial summary judgment or directed verdict because Mr. Cole acted solely as an agent for Outlaw. In addition to Mr. Klosterman's testimony that he dealt primarily with Mr. Cole, as the salesperson for Outlaw, Mr. Wyatt, the president of Outlaw testified that Mr. Cole was his employee and represented him on November 22, 1997, during the closing of the sale of the aircraft.

Tennessee law provides that an agent, dealing for a disclosed principal within the scope of his powers, is not personally liable, unless the third party gave credit exclusively to him and it was his intention to become personally liable. *Weeks v. Summerlin*, 466 S.W.2d 894, 899 (Tenn. Ct. App. 1970) (citing *Siler v. Perkins*, 149 S.W. 1060 (Tenn. 1912)). If a contract is made with a known agent acting within the scope of his authority for a disclosed principal, the contract is that of the principal alone unless credit has been given expressly and conclusively to the agent, and it

appears that it was clearly his intention to assume the obligation and he was informed that credit was extended to him alone. ***Id***. (citing ***Hammond v. Herbert Hood Co.***, 221 S.W.2d 98 (Tenn. Ct. App. 1948)).

While we agree that based on the record before us a judgment should be entered for defendant Cole, we cannot do so on the procedure suggested by defendants. This Court has held that the denial of a summary judgment motion predicated upon existence of genuine issue of fact is not reviewable where there has been a judgment rendered after the trial on the merits of a case. ***Bills v. Lindsay***, 909 S.W.2d 434 (Tenn. Ct. App. 1993). Moreover, motions for directed verdicts are appropriate in a jury trial and have no place in a nonjury trial. ***Smith v. Inman Realty Co.***, 846 S.W.2d 819 (Tenn. Ct. App. 1992). In the instant case, the only allegations against Mr. Cole is that in these contract negotiations he acted as the agent for the defendant, Outlaw, and the record contains no proof beyond these allegations.

Accordingly, the judgment against Mr. Cole is vacated.

We will now address the defendants' issues 3(b) and 3(c).

The defendants argue that the trial court erred in finding that Mr. Klosterman did not authorize the repairs that Outlaw made on the aircraft and in failing to grant Outlaw a judgment in the amount of $88,272.82 for the repairs and maintenance Outlaw performed on the aircraft plus all attorney's fees. We disagree. The trial judge accredited the testimony of Mr. Klosterman who testified that the November 22, 1997, "Purchase Order" contained, as a "Condition of Sale", a fixed price of $50,000 for all of the repairs and maintenance to be performed on the aircraft. As we have already noted, the weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Estate of Walton***, 950 S.W.2d at 959. Furthermore, Mr. Cole testified on cross-examination as follows:

> Q. Now, on your parts list – let me show this. I just want to ask you a question about that, Mr. Cole. That shows what work needs to be done to perform that annual inspection, doesn't it?
>
> A. (Reviews documents.) This looks to me like a completion –
>
> Q. Well, do you see –
>
> A. –equipment and the annual inspection.
>
> Q. All right. Do you see up on the left-hand corner or anything where it says, "I authorize this work to be done," left-hand – top left-hand corner?

A. I don't, no.

Q. You don't see anything up there?

A. No.

\* \* \*

Q. "I hereby authorize the following repairs, work to be done" –

A. But you asked me if I saw authorization.

Q. No. I'm asking you, did that not say that?

A. Oh, yeah, I can see that.

Q. All right. Do you see any signature there?

A. No. That's what I was testifying to.

Q. So Mr. Klosterman never authorized this, did he?

A. (No response.)

Q. So there is nothing in that January 23rd fax asking him to authorize the work, was there?

\* \* \*

A. Nothing in that fax, no.

From our review of the record, we find that the evidence does not preponderate against the findings of the trial court.

We will now address the plaintiff's issues.

The appellant avers that the trial court has failed to find the total sum of money that the appellant has paid under the contract, and award appellant a judgment in that amount plus interest. We agree with the appellant to the extent that the trial judge failed to restore the parties to the status quo. Therefore, in light of our previous finding concerning rescission, we modify the trial court's order to allow the appellee, Outlaw Aircraft Sales, Inc., to maintain any ownership and possession it has over the aircraft in question. We also modify the order to award the plaintiff a judgment against the defendant, Outlaw Aircraft Sales, Inc., in the amount of $78,900 which includes

defendant's $1000.00 down-payment or deposit; the initial payment of $5,000.00 to begin the maintenance on the aircraft; the purchase price paid by defendant, $72,500; and the $400.00 overpayment.  This amount does not include the $12,000 that Mr. Klosterman paid directly to CPI.

In view of our decision, the defendants' fourth issue is pretermitted.

Accordingly, the judgment of the trial court against defendant, David Cole, is vacated and modified to award judgment for plaintiff against defendant, Outlaw, in the amount of $78,900.00. The judgment is affirmed as modified, and the case is remanded to the trial court for such further proceedings as necessary.  Costs of the appeal are assessed against the appellee, Outlaw Aircraft Sales, Inc. and its surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.