N THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 19, 2019 Session

## SHARON KAY MIDDENDORF v. BYRON SCOTT MIDDENDORF

**Appeal from the Circuit Court for Davidson County**
**No. 12D-1891          Phillip R. Robinson, Judge**

_____

**No. M2018-00409-COA-R3-CV**

_____

In this appeal, the parties were declared divorced in February 2013 when the trial court approved their marital dissolution agreement and entered a final decree of divorce; at the same time, the parties entered into a separate agreement which was to govern the transfer of the wife's marital interest in four businesses operated by the husband.  In July 2014, the husband filed a motion pursuant to Rule 60.02(5) of the Tennessee Rules of Civil Procedure to have the decree set aside.  The court granted the motion and vacated the decree, reinstating the marital relationship; the court also rescinded the agreement transferring the wife's interest in the businesses on the ground of mutual mistake. Following a trial, the court entered a final decree of divorce in 2017.  Both parties appeal. Wife asserts that the trial court erred in vacating the 2013 decree, in rescinding the parties' agreement, and in failing to award her all of the attorney's fees she incurred at the trial court level.  Husband appeals the division of the marital estate in the 2017 decree, and contends that the trial court erred when it failed to order the return of payments he made to wife pursuant to the agreement that was rescinded and alimony payments he made pursuant to the 2013 decree that was vacated.  Both parties seek their attorney's fees on appeal.  Upon our review, we affirm the judgment of the trial court in all respects and decline to award fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Donald Capparella and Tyler Chance Yarbro, Nashville, Tennessee, for the appellant, Sharon Kay Middendorf.

Cathy Speers Johnson and Sarah Richter Perky, Franklin, Tennessee, for the appellee, Byron Scott Middendorf.

# OPINION

## I. Factual and Procedural History

Sharon Middendorf ("Wife") and Byron Middendorf ("Husband") were married in 1983; they are the parents of one child, who reached the age of majority in April 2018. They separated in December 2011 after Wife learned of Husband's infidelity throughout the marriage, and Wife filed for divorce on June 18, 2012, on the ground of irreconcilable differences. Husband, an experienced businessman, represented himself during the initial divorce proceedings and settlement negotiations, during which time the parties agreed on a permanent parenting plan and marital dissolution agreement ("MDA"), which included spousal support and the division of marital property and debt. Wife's counsel, who prepared the documents, filed the MDA and parenting plan with the court and set the matter on the Court's non-contested docket for February 12, 2013. At the hearing, the court declined to approve the MDA, raising concerns relative to a provision in which Husband agreed to pay Wife one-half of the total amount of distributions and income he would receive from a marital business interest as alimony. The parties negotiated further and entered into another MDA and a separate Transfer Agreement ("TA") that governed the transfer of Wife's marital interest in four businesses held in Husband's name. The court approved the MDA and declared the parties divorced by decree entered February 22, 2013 ("the 2013 Decree").

On July 1, 2014, represented by counsel, Husband filed a Petition to Modify Support, contending that the terms of the divorce were "unsustainable" and had "broken him financially in a one-year period"; he sought to have the court modify the terms of the final decree by reducing his support obligations "to an equitable level." Wife moved to dismiss the petition. Husband responded in opposition to Wife's motion, including a "Counter Motion for Relief Pursuant to T.R.C.P. 60.02(5)," in which he asserted that, during the time of the negotiations leading to the 2013 decree, he suffered a mental impairment that prevented him from advocating for himself; he requested that the court set aside the 2013 Decree "so as to come closer to conforming with our laws which require an equitable division of the marital estate." The countermotion was supported by Husband's affidavit and summaries he prepared of the terms of the initial and the final MDA and parenting plan, emails sent between Wife's counsel, Wife, and Husband, and a copy of his then-current income and expenses.[1]

Husband amended the countermotion on January 12, 2016, to seek additional relief on the basis of Rule 60.02(3), specifically, that the 2013 Decree be set aside because it "purports to incorporate the so-called Transfer Agreement [and therefore] is void as against public policy." The trial court held a hearing over three days in January

---

[1] In due course, the court denied Wife's motion to dismiss the petition to modify support as moot in light of the filing of Husband's Counter Motion for Relief.

2016 on all pending matters, including a petition filed by Wife to hold Husband in civil contempt.[2]  At the hearing, Husband and his psychiatrist testified, and Husband introduced the deposition testimony of Wife's attorneys, and nineteen exhibits.  Wife did not present proof.

After the hearing was completed, on its own initiative, the court entered an order setting a hearing for counsel to show cause why an expert accountant should not be appointed pursuant to Rule 706 of the Tennessee Rules of Evidence to give testimony as to the income tax consequences to each party of the MDA, parenting plan, and TA; the order also proposed to reopen the proof to consider additional evidence as to Wife's income and expenses.  Both parties objected to the reopening of proof as to Wife's income and expenses; each submitted the names of three accountants for the court's consideration.  Following the show cause hearing, the court entered an order reopening the proof as to the tax consequences only, and appointing Vic Alexander, a certified public accountant, to prepare a report and provide expert testimony in that regard.  Mr. Alexander duly submitted his report, and it was filed; Husband thereafter presented a report from Thomas Price, also a CPA.  The parties then filed a joint stipulation that each expert would testify to the findings contained in their respective reports and waived their right to examine and cross examine those witnesses.  After the joint stipulation was filed, the court entered an order closing the proof.

The court entered an order on May 20, 2016 (the "May 20 order"), setting aside the 2013 Decree, holding:

> In light of the Husband's history of severe sexual abuse as a child, his sexual addiction, his diagnosis of Post-Traumatic Stress Disorder and his severe depression, his inability to advocate or properly defend himself and the inequity of the alimony award in this case rendering the Husband almost unable to comply with the Court's Order, this Court finds by clear and convincing evidence that this case is one of extraordinary circumstances and extreme hardship justifying Rule 60.02(5) relief.

The court also found that Husband's delay of 15 months after the entry of the judgment was "timely and within a reasonable period."  In the same order, the court declined to hold that the reference to the TA in final divorce decree rendered the decree void; instead, the court applied the law of contracts and rescinded the TA, finding that "the parties suffered a mutual mistake as to the character and deductibility by the Husband of the Wife's share of the disbursements for income tax purposes."[3]

---

[2]  Wife sought to have Husband held in contempt for failing to comply with the terms of the MDA by not reducing the balance of the home equity line of credit and for taking advances on it.

[3]  In the May 20 order, the court also held that Husband's petition to modify, as well as the civil contempt petition that Wife had filed were moot.  Wife sought permission to file an interlocutory appeal of the

Husband thereupon answered the complaint for divorce, including a counter-complaint for divorce on the ground of cruel and inhuman treatment. Wife amended her complaint to allege adultery and inappropriate marital conduct, and Husband responded. Trial was held over two days in August 2017 at which Wife, Vic Alexander, Husband, and Thomas Price testified.

The court entered a Final Decree of Divorce on November 20, 2017 ("the 2017 decree"), awarding Wife the divorce on the ground of adultery, naming Wife as primary residential parent of the parties' son, setting child support, and establishing a parenting schedule. The court classified, valued, and divided the marital assets (including the four companies that were previously the subject of the TA) and debts, and ordered that Wife would be responsible for two-thirds of any taxes, penalties, and interest incurred by Husband, whose tax liability for tax years 2013, 2014, and 2015 was being determined in an audit by the Internal Revenue Service that had resulted from Husband's attempts to deduct the payments he made to Wife pursuant to the TA. The court found Wife's testimony relative to the nearly $19,000 in monthly expenses she sought not credible and awarded her $10,800 per month as alimony *in futuro*. The court also awarded Wife $73,000, a portion of the attorney's fees she incurred in the proceeding.

Both parties appeal. Wife contends that the trial court erred in setting aside the final decree and in rescinding the TA and that she is entitled to all of her attorney's fees incurred in the trial court. Husband asserts that the court failed to account for monies and alimony paid to Wife pursuant to the TA and the MDA, erred in its division of the marital estate, and erred in awarding attorney's fees to Wife. Both parties seek an award of attorney's fees for this appeal.

## II. ANALYSIS

Because this case was tried without a jury, our review of the trial court's factual findings is *de novo* upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. Civ. P. 13(d). Our review of the trial court's conclusions of law is *de novo* upon the record with no presumption of correctness. *Tryon v. Saturn Corp.,* 254 S.W.3d 321, 327 (Tenn. 2008).

### A. Relief Pursuant to Rule 60.02(5)

Rule 60.02 of the Tennessee Rules of Civil Procedure provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding

court's May 20 order, pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure, which the trial court granted; this Court denied the application. Neither of these holdings is challenged in this appeal.

for the following reasons: . . . (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time . . .

"Parties seeking Tenn. R. Civ. P. 60.02 relief must substantiate their request by clear and convincing evidence." *McCracken v. Brentwood United Methodist Church*, 958 S.W.2d 792, 795 (Tenn. Ct. App. 1997) (citing *Davidson v. Davidson,* 916 S.W.2d 918, 923 (Tenn. Ct. App.1995); *Duncan v. Duncan,* 789 S.W.2d 557, 563 (Tenn. Ct. App. 1990)). "These requests are addressed to the trial court's discretion, and thus appellate courts review decisions regarding Tenn. R. Civ. P. 60.02 relief using the abuse of discretion standard." *McCracken,* 958 S.W.2d at 795 (citing *Underwood v. Zurich Ins. Co.,* 854 S.W.2d 94, 97 (Tenn. 1993); *Banks v. Dement Constr. Co.,* 817 S.W.2d 16, 18 (Tenn. 1991); *Day v. Day,* 931 S.W.2d 936, 939 (Tenn. Ct. App. 1996); *Marr v. Montgomery Elevator Co.,* 922 S.W.2d 526, 528 (Tenn. Ct. App. 1995); *John Barb, Inc. v. Underwriters at Lloyds of London,* 653 S.W.2d 422, 424 (Tenn. Ct. App. 1983)). "A motion under the catch-all provision of subsection (5) filed more than a year after final judgment is generally untimely unless extraordinary circumstances excuse the party's failure to seek relief sooner." *Hussey v. Woods*, 538 S.W.3d 476, 486 (Tenn. 2017) (citing *Taylor v. Wetzel*, No. 4:CV-04-553, 2014 WL 5242076, at *6 (M.D. Pa. Oct. 15, 2014)).

In the case of *Beem v. Beem*, the husband sought to have the court set aside a marital dissolution agreement based upon his asserted lack of mental capacity to enter into such an agreement; the Court observed:

[I]t is rare indeed for a court to find that a contract is unenforceable based on the unsound emotional state of a contracting party. The party seeking to avoid a contract on this basis must show that he or she "had no reasonable perception or understanding of the nature or terms of the contract." *Roberts* [*v. Roberts*]*,* 827 S.W.2d [788] at 791-92 [(Tenn. Ct. App. 1991)]. This Court has explained the burden of proof for a party seeking to avoid a contract:

Thus, persons will be excused from their contractual obligations on the ground of incompetency only when (1) they are unable to understand in a reasonable manner the nature and consequences of the transaction or (2) when they are unable to act in a reasonable manner in relation to the transaction, and the other party has reason to know of their condition.

*McMahan v. McMahan,* No. E2004-03032-COA-R3-CV, 2005 WL 3287475, at *7 (Tenn. Ct. App. Dec. 5, 2005).

5

*Beem v. Beem*, No. W2009-00800-COA-R3-CV, 2010 WL 1687782, at *8 (Tenn. Ct. App. Apr. 28, 2010).

The trial court herein made extensive findings in the May 20 order, including the following:

> . . . The Court finds [Husband] was suffering shame and embarrassment over his sexual abuse and his behavior which resulted in the destruction of his marriage. The Court finds the Husband's testimony as to his mental state to be credible and compelling. He expressed his intent to protect his spouse and child from the shame and embarrassment of his behavior. The Court finds the Husband refused to retain counsel as he believed to do so would somehow appear to be an effort on his half to justify his behavior or defend himself. . . .

> Based on all of the foregoing, this Court finds that because of the Husband's mental state, he was unable to understand in a reasonable manner, the nature and consequences of this particular agreement or contract dealing with the support of his Wife and child under these circumstances. Further, he was unable to act in a reasonable manner regarding the Marital Dissolution Agreement in failing to seek legal advice or have the agreement reviewed by an independent attorney. Finally, the Court finds the Wife was aware of the Husband's history of abuse and his sexual addiction and that he was under the care of a psychiatrist. Having little evidence before it as to values, the Court can draw no conclusions as to the reasonableness of the division of other assets in the Marital Dissolution Agreement.

> ***

> . . . Considering the severe emotional issues suffered by the Husband and his difficulty in advocating for his own interests, the Court finds that in this unique set of circumstances, the Husband's delay of fifteen months after the entry of the judgment was timely and within a reasonable period of time as required by Rule 60.02.

> ***

> Having found that the Husband was suffering under a mental or emotional impairment that prevented him from defending or advocating for himself and under the circumstances, his relief under Rule 60.02 (5) was brought within a reasonable time, the court must now determine whether

6

the facts of this case fall into the extreme, unique, exceptional or extraordinary circumstances or extreme hardship which would justify relief. In light of the Husband's history of severe sexual abuse as a child, his sexual addiction, his diagnosis of Post-Traumatic Stress Disorder and his severe depression, his inability to advocate or properly defend himself and the inequity of the alimony award in this case rendering the Husband almost unable to comply with the Court's Order, this Court finds by clear and convincing evidence that this case is one of extraordinary circumstances and extreme hardship justifying Rule 60.02(5) relief.

Based on this ruling, the Court finds that the Final Decree of Divorce entered on the 22nd day of February, 2013, is hereby set aside in its entirety *nunc pro tunc* to February 22, 2013.

Wife argues that the Trial Court erred in finding that there was clear and convincing evidence to support the decision to set aside the final divorce decree under Tennessee Rule of Civil Procedure 60.02(5) and that the court erred in finding that the motion was timely filed. She contends that the following facts necessitate reversal:

Husband (1) negotiated the MDA for seven months before executing it, (2) admitted that he understood that he was signing a divorce decree and understood its terms, (3) Husband's medical proof showed that his cognitive abilities were not impaired at the time he reached the settlement, and (4) Husband did not file his Rule 60.02(5) motion within a reasonable time when he waited 17 months after the Final Decree was entered before requesting that it be set aside[.]

In our consideration of this issue, we are guided by the standard of review set forth in *In re Baby*:

Our review of a ruling on a motion brought pursuant to . . . Rule 60.02, however, is limited. This Court may reverse only if the trial court has abused its discretion. *Discover Bank v. Morgan,* 363 S.W.3d 479, 487 (Tenn. 2012); *Henry v. Goins,* 104 S.W.3d 475, 482 (Tenn. 2003). A trial court abuses its discretion only when it applies an incorrect legal standard, reaches an illogical result, commits clear error in its assessment of the evidence, or relies upon flawed reasoning that results in an injustice. *Armbrister v. Armbrister,* 414 S.W.3d 685, 693 (Tenn. 2013) (quoting *Gonsewski v. Gonsewski,* 350 S.W.3d 99, 105 (Tenn. 2011)).

7

447 S.W.3d 807, 817 (Tenn. 2014). We have carefully considered the evidence cited by the parties in support of their respective positions. In our review, we accord great deference to credibility determinations made by the trial court.[4]

Husband testified he negotiated the divorce settlement while he was facing chronic depression and made a conscious decision not to hire a lawyer. He testified that he wanted to punish himself in this divorce and refused to hire a lawyer because it "was like standing up for myself[;] . . to do that would have been an offense to [Wife], and I had already done so much damage." He testified that he felt shame and worthlessness in January 2012 and contemplated taking his own life; as well as that he wrote a letter to Wife on June 28, 2012, in which he stated that he, "being of sound mind and body[,] agree that I will give [Wife] all of my salary . . . [and] 50 percent of all my bonuses from Equinox Information Systems" as well as "50 percent of all proceeds of Equinox Information Systems if ever sold," their "house and all our personal goods." Husband testified that he agreed that "the financial agreements he entered into were not that of an experienced businessman" and that he was too ashamed and depressed to care; he acknowledged that during the time period he was negotiating the divorce settlement, he was the CEO of Equinox Information Systems and oversaw sales, business development, customer support and was able to understand complex concepts such as phantom income, and that he was able to negotiate more favorable terms in the MDA relating to the payment of the home equity line of credit associated with the marital residence.

Attorney Rose Palermo, who filed the original complaint on behalf of Wife, testified that she met with Husband in July 2012 to discuss the settlement agreement he and Wife had come to, and that during the meeting, Husband was "absolutely determined he was going to get this case settled" and that he "is a very bright man," "very polite," and that she "didn't observe him being impaired in any way." She testified that he appeared to perceive and understand the nature and terms of the MDA. She also testified that husband "didn't have any problems functioning in the real world. . . . just . . . in his personal life." Attorney Beth Tannenbaum, who also represented Wife, testified that, during the settlement discussion in July 2012, Husband stated that "he did not want his wife to have change in her lifestyle, he did not want their son to change his lifestyle, and that he came up with a game plan to allow them to do this."

Husband's psychiatrist, Dr. Karen Rhea, provided extensive testimony relative to Husband's mental condition and aspects of his life history bearing on his condition. She testified that she began treating Husband in January 2013, and after an evaluation, diagnosed him with "post-traumatic disorder, chronic; major depressive disorder, single

---

[4] It is well settled that the "weight, faith and credit to be given to any witness' testimony lies in the first instance with the trier of fact and the credibility accorded will be given great weight by the appellate court." *Mays v. Brighton Bank,* 832 S.W.2d 347, 352 (Tenn. Ct. App. 1992).

episode severe without psychotic features"; and "chronic low-grade depression." She testified that prior to seeing her, Husband had been treated by another psychiatrist, Dr. Scott West, since January 2012, and two others prior to that. When asked whether Husband had the capacity to enter into the MDA and comprehend what he was doing, Dr. Rhea testified:

> A. I think Mr. Middendorf was severely impaired, not only by his depression, but by his post-traumatic stress disorder. And because of the way post-traumatic stress impacts the triggers, and the areas are somewhat more specific, so this was really -- signing the divorce decree would really be into an area where he has trouble functioning.
> Q. Okay. And what area would that be?
> A. Well, in his family life. If you recall, he was abandoned by his father and abused at the same time. And abandonment was not something that he deals well with.

Dr. Rhea also testified that "shame is often associated with those who are sexually abused"; that shame can be debilitating; and that in her medical opinion, Husband's shame factored into his choice to not retain counsel because he "was unable to ask for help for himself. . . [and] chose a punishing -- self-punishing way of moving forward." She also testified that it was her medical opinion that Husband was clinically depressed and suffering from post-traumatic stress in January and February of 2013 and that he was severely impaired when he entered into the MDA without the advice of counsel. On cross examination, Dr. Rhea testified that the notes of Dr. West, who was Husband's psychiatrist in January 2012 through January 2013, indicate that though Husband was depressed, his thoughts were still organized and deliberate. Dr. Rhea also testified that she concluded that his thought process was organized and logical and that his judgment was moderately impaired when she saw him on January 28 and again on February 11, 2013. She also testified that Husband had the mental capacity to understand that he was signing a legal document in February 2013.

Dr. Rhea testified about her treatment of Husband after the entry of the divorce in February 2013. She stated that he reported "significant increase in sadness following his divorce"; that in May 2013, he reported that his mood had been stable and he had been well enough to confront his abuser and reestablish connections with his siblings; that in June he appeared to be doing better and had a "genuine smile" and was "engaging and exploring his improved mood." Dr. Rhea testified that in October and November of 2013, Husband was confused and weary, had trouble sleeping, and felt more depressed; that in May 2014, Husband reported that he is "mentally being worn out by ex-wife" and his mood was "reasonably good but very challenged by his pain and impaired sleep." Dr. Rhea also testified that in August 2014, Husband "appeared physically exhausted and was tearful in the session about not being in control related to his life and Isaac's and

9

having an unworkable financial situation" and that Husband stated that he felt "cheated by the settlement."

The testimony of Husband and Dr. Rhea provides clear and convincing evidence that Husband was unable to understand in a reasonable manner the nature and consequences of the MDA and supports the trial court's finding that Husband's cognitive abilities were impaired with respect to his ability to advocate for himself or understand the terms of the MDA. Additionally, the testimony of Dr. Rhea as to Husband's vacillating treatment history following the entry of the 2013 divorce decree supports the conclusion that Husband's delay in filing for Rule 60.02(5) relief for 17 months was reasonable. While we do not disagree with Wife that the evidence also shows that Husband's cognitive abilities were not limited in certain aspects of his life and that his judgment with respect to those areas was not seriously impaired, the evidence supports more than one conclusion, thereby presenting a situation in which reasonable minds could disagree as to the propriety of the decision made. Under such circumstances, we must uphold the trial court's ruling. *Discover Bank v. Morgan*, 363 S.W.3d 479, 487 (Tenn. 2012) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Viewed in its entirety, and giving credence to the court's determination that Husband's testimony was "credible and compelling," we discern no abuse of discretion in the trial court's grant of relief to Husband pursuant to Rule 60.02(5).

## B. Rescission of the Transfer Agreement

In the May 20 order, after setting aside the final decree, the court addressed the Transfer Agreement, holding:

> The Court finds that the parties were mutually mistaken as to the nature of the disbursements i.e., a division of property as opposed to alimony and further, were mistaken that the payments by the Husband to the Wife would be deductible to him for income tax purposes. As a result of these mutual mistakes, the Husband has incurred a tax liability for these payments for 2013, 2014, 2015 and year-to-date 2016 which was unintended by the parties or by the terms of their agreement. While the Husband's pleadings contained no allegation of mutual mistake, the Husband clearly addressed this issue in his testimony regarding his tax liability in the event the Wife no longer claimed the disbursements as alimony. Counsel for the Wife did not object to this line of questioning although he did voice objections to hearsay evidence on the issue. . . . The Court finds that the parties tried the issue of the deductibility of the disbursements to the Husband for federal income tax purposes and the issue of mutual mistake by implied consent under Rule 15.02.
>
> ***

10

In the instant case, the Court finds that the parties suffered a mutual mistake as to the character and deductibility by the Husband of the Wife's share of the disbursements for income tax purposes. The contract was drafted by the Wife's attorneys. This mistake was material and goes to the very heart of the parties' efforts to allow the Wife to share in the profits of the Husband's business. The Court finds that the mistake was not due to the Husband's negligence and further, that the Husband has suffered injury by accruing a tax liability as a result of this mutual mistake. The Court, therefore, finds that this is an appropriate circumstance to rescind the terms of this contract.

Wife contends that the trial court erred in rescinding the TA "when (1) the trial court erred in failing to apply the required heightened clear and convincing standard of proof, (2) Husband failed to plead mutual mistake of fact, and (3) there was not a mutual mistake of fact, but only a mistaken view of the law."

### 1. *Trial on the Issue of Mutual Mistake by Consent*

As an initial matter, we take up Wife's contention that Husband failed to plead mutual mistake of fact. In this regard, the trial court held that "the parties tried the issue of the deductibility of the disbursements to Husband for federal income tax purposes and the issue of mutual mistake by implied consent under Rule 15.02."[5] Wife contends that "the record does not support the argument that the parties tried the issue of mutual mistake of fact by consent, implied or otherwise"; for the following reasons, we disagree and affirm the court's conclusion.

---

[5] Rule 15.02 of the Tennessee Rules of Civil Procedure reads:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. Provided, however, amendment after verdict so as to increase the amount sued for in the action shall not be permitted. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice that party in maintaining the action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

11

"'Generally speaking, trial by implied consent will be found where the party opposed to the amendment knew or should reasonably have known of the evidence relating to the new issue, did not object to this evidence, and was not prejudiced thereby.'" *Abdur'Rahman v. Parker*, 558 S.W.3d 606, 622 (Tenn. 2018), *cert. denied sub nom. Zagorski v. Parker*, 139 S. Ct. 11, 202 L. Ed. 2d 258 (2018), and *cert. denied sub nom. Miller v. Parker*, 139 S. Ct. 626, 202 L. Ed. 2d 454 (2018), and *cert. denied,* 139 S. Ct. 1533 (2019) (quoting *Zack Cheek Builders v. McLeod*, 597 S.W.2d 888, 890 (Tenn. 1980)). "The most important factor is whether the opposing party 'would be prejudiced by the implied amendment, i.e., whether he had a fair opportunity to defend.'" *Id.* (quoting *Zack Cheek Builders*, 597 S.W.2d at 891). "The rules relating to amendment of pleadings are liberal, vesting broad discretion in the trial court." *Biscan v. Brown*, 160 S.W.3d 462, 471 (Tenn. 2005).

With respect to the first element, evidence relating to the issue of mistake included the affidavit Husband filed with the countermotion for relief under Rule 60.02, his testimony at the January 2016 hearing, and the experts' report. In appointing Mr. Alexander to advise the court on the tax consequences to each party of the MDA, parenting plan, and TA, the court was concerned that the parties' understanding of the tax consequences of the agreement was correct; the parties filed numerous pleadings and participated in the show cause hearing to determine if the proof would be reopened to consider this issue. The evidence addressed the parties' erroneous understanding of the tax implications of the TA and the appropriate relief. The record clearly shows that Wife was on notice that Husband was seeking to negate the effect of the TA because it did not accomplish their objective and defeated their intent.

With respect to the second element, in addition to appointing Mr. Alexander as expert and receiving his report, the court accepted additional proof relating to the deductibility of payments made by Husband to Wife pursuant to the TA. Wife's objection to the reopening of proof was to being called to testify as to her income and expenses; she did not object to the court's appointment of Mr. Alexander to advise the court and parties relative to the deductibility issue. Similarly, Husband's objection to the reopening of proof dealt with Wife's income and expenses, not the Court's calling of an expert witness. Ultimately, the court decided to not reopen the proof with respect to Wife's income and expenses. At the show cause hearing, Wife's counsel did not object to the appointment of an expert—even stating on the record that "we can appoint an expert"—and submitted names of three accountants. At the January 2016 hearing on the pending motions, Husband testified without objection that the parties initially believed that the payments made pursuant to the TA would be deductible by him as alimony payments and that Wife had recently acted in a way that indicated she no longer believed that was the case when she amended her tax returns to reflect the payments were "other income," not alimony. Wife has not cited to any objection she made to the introduction of evidence of mistake and, upon our review, there was no objection to evidence of the

parties' mutual, and erroneous, belief that the payments to Wife would be deductible as alimony.

With respect to the third element, whether Wife had an opportunity to defend against the introduction of evidence relating to the mutual mistake of the parties, we again note that Husband testified without objection that the parties initially believed the payments made pursuant to the TA would be deductible by him and that Wife had recently amended her tax returns, indicating she no longer believed that the payments were alimony. Further, Wife entered into a joint stipulation and waived her right to examine or cross examine the expert witnesses addressing this issue; she had ample opportunity to defend against the introduction of evidence relative to this issue.

For these reasons, we agree with the trial court that the issue of mutual mistake was tried by implied consent; we proceed to address the contentions that the evidence did not clearly and convincingly support rescission of the Transfer Agreement and that the parties made a mutual mistake of law, not of fact, beginning with a discussion of applicable law.

"Although rescission is not favored in Tennessee, the law provides that rescission is available when there is a mutual mistake." *Klosterman Dev. Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 631 (Tenn. Ct. App. 2002). In *Pugh's Lawn Landscape Co., Inc. v. Jaycon Dev. Corp.*, the Tennessee Supreme Court held:

> [A] "mistake" exists in a legal sense when a person, acting on an erroneous conviction of law or fact, executes an instrument that he or she would not have executed but for the erroneous conviction. *State ex rel. Mathes v. Gilbreath,* 181 Tenn. 498, 181 S.W.2d 755, 757 ([Tenn.] 1944); *Metro. Life Ins. Co. v. Humphrey,* 167 Tenn. 421, 70 S.W.2d 361, 362 ([Tenn.] 1934). A court may not rescind a contract for mistake unless the mistake is innocent, mutual, and material to the transaction and unless the complainant shows an injury. *Klosterman Dev. Corp.,* 102 S.W.3d at 632 (quoting *Robinson v. Brooks,* 577 S.W.2d 207, 209 (Tenn. Ct. App. 1978)); *see also Atkins v. Kirkpatrick,* 823 S.W.2d 547, 553 (Tenn. Ct. App. 1991); *Wilson v. Mid–State Homes, Inc.,* 53 Tenn.App. 520, 384 S.W.2d 459, 463–64 ([Tenn. Ct. App.] 1964).

320 S.W.3d 252, 261 (Tenn. 2010). Further, this Court held in *Hunt v. Twisdale:*

> Equity will grant relief for mistake "not only when the mistake is expressly proved, but also when it is implied from the nature of the transaction." *Klosterman,* 102 S.W.3d at 631–32 (quoting *Robinson v. Brooks,* 577 S.W.2d 207, 208 (Tenn. Ct. App. 1978)). However, if based on mutual mistake, the intent of both parties must be clear and must be the

13

same. *Russell v. Security Ins., Inc.,* No. 01A01-9803-CV-00135, 1999 WL 74787, at *1 (Tenn. Ct. App. M.S. Feb. 18, 1999). The mistake must be shown by "clear, cogent, convincing evidence." *Lane v. Spriggs,* 71 S.W.3d 286, 290 (Tenn. Ct. App. 2001) (citing *Dixon v. Manier,* 545 S.W.2d 948, 950 (Tenn. Ct. App. 1976)).

No. M2006-01870-COA-R3-CV, 2007 WL 2827051, at *8 (Tenn. Ct. App. Sept. 28, 2007). "The equitable remedy of rescission is not enforceable as a matter of right but is a matter resting in the sound discretion of the trial court and the court should exercise the discretion sparingly." *Klosterman Dev. Corp,* 102 S.W.3d at 632 (citing *Vakil v. Idnani,* 748 S.W.2d 196, 199 (Tenn. Ct. App. 1987)).

2. *Whether the Evidence Supports a Conclusion that There Was a Mutual Mistake*

The TA provided that, in exchange for Wife relinquishing and transferring her marital interest in the business interests "held in Husband's name," Husband would pay Wife one-half of the total amount of distributions and income he received from one of those business interests, Equinox Information Systems, "to the extent that the total of such distributions and income received by Husband from all such entities exceeds $204,000.00 in any calendar year." At issue in this appeal is the provision in the TA that "[t]he parties agree that all payments made under this provision shall be deductible to Husband and includable in Wife's income for federal and state income tax purposes."

Husband testified that he believed the TA was part of the final decree of divorce; that it contained the same terms that were in the original MDA that was not approved by the court; that he believed the payments made pursuant to the TA were taxable to Wife and deductible by him because they were alimony; and that the parties had initially filed their income tax returns that way, though he had recently learned that Wife had amended her tax returns to reflect the payments as "other income," not alimony. Husband testified about the result of these payments not being categorized as alimony:

> A. . . . "[I]f I cannot deduct the -- under transfer agreement there, if I cannot deduct the payments that I'm making to Ms. Middendorf, then I have to pay 39.6 percent marginal tax rate on the full amount of the bonus distributions. I also have to pay 50 percent of those bonus distributions to Ms. Middendorf. So that leaves me $30,000 in the hole each month."
> THE COURT: . . . Is this a result of the transfer agreement?
> THE WITNESS: Yes.
> THE COURT: Then you didn't get what you bargained for, did you? Weren't you supposed to be able to deduct these?
> THE WITNESS: Yes.

14

Husband prepared and admitted into evidence a calculation of expenses which showed that he was obligated to give Wife half of his 2015 bonus of $490,959.79; because it was not alimony, the amount was not deductible by him and he was taxed at a rate of 39.6 percent of the total, or $194,429.08, which would leave him with $51,059.82. The same exhibit showed that he had $81,856.25 in expenses relating to Wife and their child in 2015, so with the $51,059.82 bonus, he had a negative net income of $30,796.43 before his own living expenses. Wife did not offer any testimony or evidence on this issue. Also before the court were the expert witnesses' reports on the deductibility of the payments made to Wife under the Transfer Agreement; each expert opined that, under his interpretation of the Internal Revenue Code, the payments did not constitute alimony and were therefore not deductible by Husband.[6] The evidence clearly and convincingly shows that Husband and Wife erroneously believed that the payments made to Wife under the Transfer Agreement would be deductible to Husband, constituting a mutual mistake.

---

[6] Vic Alexander opined as follows:

> In my opinion the payments to be made under the Transfer Agreement do not meet the requirements to be deducted as alimony because they do not cease at the Wife's death. The payments under the Transfer Agreement are not deductible by the Husband because they represent payments for the transfer of the business interest under [Internal Revenue] Code § 1041 in my opinion.

Similarly, Thomas Price opined:

> The Transfer Agreement ("Agreement") attempts to accomplish the income tax treatment afforded alimony payments. The payments from Bryon Middendorf to Sharon Middendorf are calculated with respect to distributions and income from certain business interests owned by the former. There are also payments called for in the event of a sale of the business interest(s). The details of how the payment calculations are made do not impact the income tax treatment of the parties.

> The Agreement provides that the payments called for continue after the death of Sharon Middendorf. This provision precludes treating the above described payments as alimony for income tax purposes.

> ***

> The Agreement states that the parties agree that distributions and income to be paid "shall be deductible to the Husband and includible in Wife s income for federal and state income tax purposes." The language in the Agreement cannot alter the income tax treatment of the payments. As noted above we think that IRC Section 1041 governs the payments and as such can't be deducted by Mr. Middendorf for federal income tax purposes nor would the payments be taxable to Sharon Middendorf.

### 3. *Did the Court Abuse its Discretion in Rescinding the Transfer Agreement*

Wife argues that the rescission is not warranted because the parties' mistake was one of law, i.e., how the payments made pursuant to the TA would be treated under federal income tax law, rather that one of fact. We have determined, however, that under the facts and circumstances of this case, the characterization of the mistake as one of law or fact is not dispositive of this issue.

Generally, a mutual mistake of law is not grounds for rescission. *State ex rel. McCormack v. Am. Bldg. & Loan Ass'n,* 150 S.W.2d 1048, 1065 (Tenn. 1941). However, "if the parties have made an honest mistake of law as to the effect of an agreement, or where they are ignorant of the law when they form the contract, and the result is different from what they intended, then the contract can be unenforceable for lack of mutual assent." 21 Tenn. Prac. Contract Law and Practice § 6:50 (citing *Farrell v. Third Nat. Bank,* 101 S.W.2d 158 (Tenn. Ct. App. 1936)). In *Farrell* this Court observed:

> If both parties to a contract make an honest mistake of law as to its effect, or are ignorant of a matter of law and enter into the contract for a particular object, the result of which would by law be different from what they mutually intended, the court will interfere to prevent the enforcement of the contract, and relieve the parties from the unexpected consequences of it. *** And a mistake of law on the part of both contracting parties, owing to which the object of their contract cannot be attained, is sufficient ground for setting aside such contract.

101 S.W.2d at 164 (internal citations omitted). Similarly, our analysis is guided by the following statement from *Corpus Juris Secundum* on Contracts:

> A mutual mistake of law can be grounds for rescission of a contract, and where the mistake of law is mutual, equity will sometimes relieve on the ground of surprise. Likewise, when all the parties think that they understand the law, but all are mistaken in the same way, a mistake of law will permit the rescission of the contract. However, a mutual mistake of law is not a ground for relief from an agreement entered into with a full knowledge of the facts.
>
> In order for a party to claim mutual mistake of the law, the parties must both be mistaken as to the law at the time the contract is entered into.

17A C.J.S. Contracts § 191 (2019) (footnotes omitted). In entering into the TA, the parties believed that the payments to Wife would be deductible under the Internal Revenue Code; the experts agreed that, in actuality, the Code would not permit the

payments to be treated in that manner. Thus, the mistake was that the result they sought, i.e., that the payments could be deducted by Husband as alimony, was different from what they intended; as either a mistake of fact or one of law, the mistake was mutual and provided a sufficient basis for the court to consider rescinding the TA. *See Farrell*, 101 S.W. 2d. at 164.

"In order to authorize relief for mistake[,] the mistake generally must have been mutual, and it must have been material, and not due to the complainant's negligence; and complainant must show injury." *Klosterman Dev. Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 632 (Tenn. Ct. App. 2002) (quoting *Robinson v. Brooks,* 577 S.W.2d 207, 209 (Tenn. Ct. App. 1978)). We now address those matters.

With respect to the materiality of the mistake, the TA contains explicit language discussing the deductibility of the payments, and Husband testified that his inability to deduct the payments would be significant, as he had "to pay 39.6 percent marginal tax rate on the full amount of the bonus distributions payments," instead of being taxed on only the portion he retained. This is clear and convincing evidence that the tax treatment of the payments, specifically, that they would be deductible to Husband as alimony, was material to the parties' agreement.

With respect to the question of whether the mistake was due to Husband's negligence, while Wife contends that Husband was "grossly negligent," the evidence she cites in support of her contention is only the TA and the 2017 divorce. She argues that Husband was negligent when he "failed to get tax advice and attempted to deduct the payments as alimony." The agreement, however, was prepared by Wife's counsel and specifically provided "[t]he parties agree that all payments made under this provision shall be deductible to Husband and includable in Wife's income for federal and state income tax purposes." Moreover, the order setting aside the TA preceded 2017 divorce decree; thus, the 2017 decree was not before the court at the time it rendered its order and cannot constitute evidence to support Wife's contentions. There is no competent evidence that the mistake was a result of Husband's negligence.

As to Husband's "injury," the two expert witnesses testified that the payments were not alimony and therefore were not deductible by Husband. Husband testified that if he could not deduct the payments he made to Wife, "then I have to pay 39.6 percent marginal tax rate on the full amount of the bonus distributions. I also have to pay 50 percent of those bonus distributions to Ms. Middendorf. So that leaves me $30,000 in the hole each month."[7] His testimony that he is facing a significant financial burden by paying the taxes on, instead of deducting, the money that Wife ultimately receives from

---

[7] It is apparent from the record and the exhibit about which Husband was testifying when he made this statement that his deficit was approximately $30,000 per year rather than per month.

the disbursements from the business interests is clear and convincing evidence of his injury.

Accordingly, we conclude that the record contains clear and convincing evidence supporting the trial court's discretionary decision to rescind the Transfer Agreement.

### C. The 2017 Divorce Decree

We now address Husband's contentions that, in the 2017 decree, the court failed to order that Wife repay to him or otherwise account for monies and alimony he paid to Wife in accordance with the TA and MDA, erred in its division of the marital estate, and erred in awarding attorney's fees to Wife. In the May 20 Order, after setting aside the 2013 Decree and rescinding the TA, the trial court declared that "the marital relationship between the parties is hereby reinstated," set aside Husband's alimony and child support obligations and declared that "[e]ach party may use the assets in their respective possession or under their control for the purpose of paying their regular monthly expenses pending a hearing to set temporary child support and alimony." By order entered August 11, 2016, the court set temporary support for Wife at $10,800 per month and child support at $2,100 per month, and ordered that all disbursements from Equinox Information Systems were to be held in "a separate account in the name of the parties jointly," and Husband was permitted to pay the child's expenses, but not his child support obligation, from this account.

After a two-day hearing in August 2017 on the cross petitions for divorce, the trial court entered the 2017 decree in which it: awarded the divorce to Wife on the ground of Husband's adultery; set a parenting plan; valued and divided the marital estate; awarded Wife alimony *in futuro* in the amount of $10,800 per month, plus the cost of her medical insurance[8]; and awarded Wife attorney's fees in the amount of $73,000. Husband raises the following issues:

> 1. Whether the trial court erred in failing to account for the monies transferred to Ms. Middendorf pursuant to the rescinded February 15, 2013 Transfer Agreement?
> 2. Whether the trial court erred in failing to account for the alimony payments made to Ms. Middendorf pursuant to the vacated February 22, 2013 Marital Dissolution Agreement?
> 3. Whether the trial court erred in the division of the marital estate?

With respect to the first issue, Husband argues that "the remedy of rescission requires that Wife return the $429,100 in payments [Husband] made pursuant to [the] Transfer Agreement" and that "the trial court failed to make any reconciliation of the

---

[8] The court found that "wife is not a credible witness on the issue of her monthly needs."

18

payments [Husband] made pursuant to the Transfer Agreement." He argues that the court did not properly "account for" the $429,100 he paid pursuant to the TA in the division of the marital estate and that Wife should have either been required to return the payments or the payments should have been credited against her share in the division of the marital estate. Wife argues that "[b]ecause the parties' marriage was reinstated and there was never a period of time when they were not married, the trial court was correct not to effect a different allocation of marital property or to require Wife to pay back amounts paid to her under the Transfer Agreement." For the reasons set forth below, we agree with Wife.

Both parties cite *Mills v. Brown*, 568 S.W.2d 100 (Tenn. 1978), a case in which our Supreme Court addressed rescission and other remedies. In *Mills*, the purchasers of real property brought a suit for damages against the sellers, alleging a deficiency in the number of acres sold; in turn, the sellers sued the persons from whom they had purchased the property. Prior to trial the original plaintiffs sold the property for more than they paid for it, despite the deficiency in acreage. *Id*. at 101. The trial court held, and the Court of Appeals affirmed, that the plaintiffs had in effect "ratified" their purchase when they sold the property at a profit and denied the plaintiffs relief. *Id*. On further appeal, the Supreme Court reversed the judgments and entered a money judgment in favor of plaintiffs. *Id*. at 103. The Court acknowledged that rescission was one of the remedies available in cases of mutual mistake, that the election of remedies in that case was with the plaintiffs, who had been damaged by the mistake, and held that foregoing the equitable remedy of rescission did not preclude them, under the circumstances presented, from recovering damages. *Id*. at 102. In so doing, the Court acknowledged that rescission "involves the avoidance, or setting aside, of a transaction . . . [and u]sually it involves a refund of the purchase price or otherwise placing the parties in their prior status." *Mills*, 568 S.W.2d at 102.

Equitable principles apply in this case, as well. *See Vaccarella v. Vaccarella*, 49 S.W.3d 307, 315 (Tenn. Ct. App. 2001) ("Judges in domestic relation cases have broad discretion to fashion an appropriate remedy considering all of the circumstances of an individual case."). Here, the Transfer Agreement was entered into in the parties' attempt to divide marital assets. The trial court correctly noted that one effect of setting aside the TA was that the parties retained their marital status; thus the business interests that were the subject of the TA retained their character as marital assets and the disbursements from them remained marital property. In dividing the property, the court valued and divided the marital property as of the date of the hearing as it is obliged to do, Tenn. Code Ann. § 36-4-121(b)(1)(A)[9]; the court awarded Husband the business interests and gave Wife a

---

[9] Tennessee Code Annotated section 36-4-121(b)(1)(A) provides in pertinent part, "All marital property shall be valued as of a date as near as possible to the date of entry of the order finally dividing the marital property."

19

judgment for $704,371 for her marital interest in them. The monies Husband contends should be reimbursed to him or otherwise "accounted for" in the division of marital property, are monies that would have been part of the marital estate, with Wife having access thereto, during the period between the parties' separation and their final divorce. We also note that the 2017 decree requires Wife to pay two-thirds of any tax liability Husband incurred as a result of an IRS audit relating to Husband's failure to properly report and pay taxes on the payments he made to Wife pursuant to the Transfer Agreement. Under the facts of this case and considering the range of alternatives available to the trial court in fashioning a remedy, we conclude that the court did not abuse its discretion in not requiring Wife to return the payments made pursuant to the Transfer Agreement.

Similarly, with respect to his arguments that the court failed to account for the alimony payments pursuant to the vacated 2013 decree, Husband argues that, in setting aside the final decree, the trial court "was required to restore the parties to the position occupied prior to the judgment being enforced" and he was therefore "entitled to recoup the payments he made pursuant to the vacated judgment."

Upon the same rationale as explained in our resolution of the issue raised relative to the payments made pursuant to the TA, we conclude that this argument is without merit. Simply put, the payments made by Husband pursuant to the 2013 Order through the date of the interim support order in August 2016 were made during a period he would otherwise have been contributing to Wife's support within the marital relationship. The Court did not abuse its discretion in not ordering that Wife reimburse Husband for payments of alimony made during the 2013-2016 period.

Husband next argues that the division of the marital estate was inequitable because Wife did not contribute to the preservation or appreciation of Equinox Information Systems from 2013-2016. He asserts that he should have been awarded "the vast majority, if not all, of the appreciation in EIS which occurred after the entry of the vacated February 22, 2013 Final Decree of Divorce." We respectfully disagree.

The division of marital assets is governed by equitable principles, reflected in the factors at Tennessee Code Annotated section 36-4-121(c).[10] As a general matter,

---

[10] Tennessee Code Annotated section 36-4-121(c) provides:

In making equitable division of marital property, the court shall consider all relevant factors including:
(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

20

reviewing courts will evaluate the fairness of a property division by its final results. *Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007); *Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990). Further, "unless the court's decision is contrary to the preponderance of the evidence or is based on an error of law, we will not interfere with the decision on appeal." *Sullivan v. Sullivan*, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002) (citing *Goodman v. Goodman*, 8 S.W.3d 289, 298 (Tenn. Ct. App. 1999)). Thus, appellate courts ordinarily defer to the trial court's decision unless it is inconsistent with the factors in Tennessee Code Annotated section 36-4-121(c) or is not supported by a preponderance of the evidence. *Jolly v. Jolly*, 130 S.W.3d 783, 785-86 (Tenn. 2004).

The trial court made findings with respect to each factor prior to dividing the assets. Pertinent to Husband's contention, the court found with respect to factor (5) that each of the parties contributed to the acquisition, preservation, and appreciation of the marital estate until their separation in 2011; that Husband continued to work and provide substantial financial support for Wife and their child for the last five and a half years, pursuant to the 2013 decree; and that "[s]ince the parties' December, 2011 separation, the Wife has understandably made little, if any, contribution as a wife or homemaker for the benefit of the Husband nor has she played any role in the preservation or appreciation of the parties' business assets." Husband does not argue that the finding as to this factor is not supported by the evidence or cite to evidence that preponderates against it.

After making findings relative to the remaining factors, the court divided the property, incorporating many of the facts relative to factor (5)(A) in its ruling:

Pursuant to T.C.A. 36-4-121, the Court is required to distribute marital property prior to any determination as to whether it is appropriate to order

---

(4) The relative ability of each party for future acquisitions of capital assets and income;
(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
  (B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.
(6) The value of the separate property of each party;
(7) The estate of each party at the time of the marriage;
(8) The economic circumstances of each party at the time the division of property is to become effective;
(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
(10) The amount of social security benefits available to each spouse; and
(11) Such other factors as are necessary to consider the equities between the parties.

the support of one of the parties by the other and to equitably divide the marital property without regard to marital fault. In so doing, the Court finds that until the separation of the parties in December, 2011, each of the parties had satisfactorily fulfilled their role as a spouse to the other party. Thereafter and up until the entry of the decree of divorce on February 22, 2013, the Husband was still providing substantial financial support for the Wife and the parties' minor child. However, after the parties' separation in December, 2011, the Wife performed few, if any, spousal duties and provided little spousal support for the Husband. The Wife's substantial reduction in performing spousal duties for the Husband is understandable due to the separation and the estrangement of the parties during the divorce action. Thereafter, from February, 2013 to date, the parties have lived separate lives. During that time, the Husband has continued to be involved with the parties' son and has continued to provide substantial financial support for the Wife and his son. The Wife performed no spousal duties which benefited the Husband. During this time, the Husband was CEO of EIS, devoting the majority of his time to the day-to-day operation of that company. As has been testified to by the valuation experts in this cause, since the end of 2013, EIS has sustained significant growth with increased sales and profits. Indeed, one of the valuation experts chose to use only the last three years, 2014, 2015 and 2016, in calculating the value of the parties' interest in the business, giving greater weight to the more recent years. During this three-year period, the parties were leading separate lives. The Husband's efforts since the entry of the original divorce decree have unquestionably resulted in a significant appreciation of the value of the parties' interest in EIS. While some of the increased growth is no doubt the result of market forces, the Husband's day-to-day management of the business as CEO unquestionably played a role. The Court acknowledges that the parties' circumstances are unique. However, based on all of the foregoing, the Court finds that it is appropriate to make a disproportionate division of the parties' marital estate in favor of the Husband.

The court divided all of the marital assets, resulting in a "52.5% / 47.5% division in favor of Husband."

Unlike Husband, in our review of the court's exercise of its discretion, we do not consider the Court's finding as to statutory factor (5) in isolation. The final decree makes clear that the court considered the nature and quality of Wife's contributions as a wife or homemaker to the preservation or appreciation of the parties' marital assets, including EIS, prior to and after the parties separated in 2011; it then proceeded to weigh all factors, resulting in a division of the marital estate in which Husband received the greater portion. The fact that Wife did not perform spousal duties after their separation which directly benefitted Husband in the same manner as before was reasonable, in light of the

22

circumstances leading to Husband's decision to vacate the marital home; moreover, Wife retained her role as primary residential parent during the period, thereby allowing Husband to devote his time and efforts to EIS. In addition, the court noted that part of EIS' rise in value over the period was due to market forces. In dividing the marital property, the court's findings encompass the pertinent factors and are supported by the evidence; the court did not misapply the statutory factors.[11] Affording the court the deference called for by our standard of review, we affirm the division of the marital estate.

## D. Attorney's Fees

"[A]n award of attorney's fees in a divorce case constitutes alimony *in solido*." *Jekot v. Jekot*, 362 S.W.3d 76, 85 (Tenn. Ct. App. 2011) (citing Tenn. Code Ann. § 36-5-121(h)(1); *Herrera v. Herrera,* 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996)). The party requesting attorney's fees has the burden to establish a *prima facie* claim for reasonable attorney's fees. *Wilson Mgmt. Co. v. Star Distribs. Co.,* 745 S.W.2d 870, 873 (Tenn. 1988). "The decision to award attorney's fees to a party in a divorce proceeding is within the sound discretion of the trial court and will not be disturbed upon appeal unless the evidence preponderates against such a decision," *Storey v. Storey,* 835 S.W.2d 593 (Tenn. Ct. App. 1992).

The court addressed the parties' requests for attorneys' fees as follows:

---

[11] We review the division of property under the abuse of discretion standard of review. *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). A succinct explanation of this standard was set forth in *Lee Medical, Inc. v. Beecher*:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the court below, or to substitute their discretion for the lower court's. The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny.

> Discretionary decisions must take the applicable law and relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

312 S.W.3d 515, 524-25 (Tenn. 2010) (internal citations omitted).

Each of the parties has requested that they be awarded their respective attorney fees in this cause. Each of the parties has incurred substantial attorney fees. The Husband is requesting attorney fees and related expenses totaling $313,875. Based on the Husband's income, the Court finds that the Husband has sufficient resources to pay his own attorney fees. His request for fees is respectfully denied. The Court finds the Wife is the financially disadvantaged spouse and was awarded the divorce based on the adulterous behavior of the Husband. The Court finds that attorney fees are awarded as a form of spousal support in divorce actions. In considering the request for attorney fees, the Court notes that the facts of this case are unusual and its procedural history unique. Based on the Wife's fee affidavit, she claims total fees and related expenses in the amount $313,215 (Late Filed Trial Exhibit 36). $137,300 of these fees were incurred by the Wife in defending against the Husband's petition for relief from the original Final Decree and Transfer Agreement and his Rule 60.02 motion. The Wife was not successful in that effort. The Wife's request for fees for her current attorney to finalize the divorce total $138,906 with an additional $37,008 for expert expenses. There was little dispute over the issue of custody, private school or child support; the ground for divorce was admitted and stipulated; and most of the assets of the parties were clearly defined and their values readily ascertainable. Only the value of EIS was in dispute. The Court is surprised at the amount of the fees under the circumstances and also that a greater effort was not made by each of the parties to compromise and settle their differences. However, considering all of the foregoing, the Court finds that the Wife is entitled to a portion of her reasonable attorney fees.

\*\*\*

It is further ORDERED that the Wife, Sharon Kay Middendorf, shall be awarded a portion of her reasonable attorney fees in the amount of $73,000 and a judgment against the Husband, Byron Scott Middendorf, in said amount for which execution may issue.

Wife contends that she should also be awarded fees for litigation relating to setting aside the first decree and in this appeal; she argues that her "resources would be substantially depleted if she were required to shoulder all of the litigation expenses incurred as a result of Husband's Rule 60.02 motion." Husband contends that the trial court erred in awarding fees to Wife at trial and seeks his attorney's fees on appeal.

In the order, the court discussed the evidence and legal basis of the award, as alimony *in solido*. Wife does not dispute that approximately one-half of the amount she sought was incurred in litigating the Rule 60 portion of the proceeding, and the award was based on fees incurred during the second divorce proceeding. The award of fees is

24

left to the sound discretion of the trial court, and she has not presented a compelling argument that the court abused its discretion. Upon the record presented, and for the reasons set forth in the trial court's order, we affirm the award of $73,000 in fees to Wife.

Turning to both parties' request for their attorneys' fees on appeal, "The decision to award attorney fees incurred on appeal lies solely within the discretion of the appellate court." *Andrews v. Andrews*, 344 S.W.3d 321, 340 (Tenn. Ct. App. 2010). In the exercise of our discretion, and in light of our resolution of the issues in this appeal, we decline to award attorneys fees for the appeal to either party.

## III. CONCLUSION

For the forgoing reasons, we affirm the judgment of the trial court in all respects.

_____
RICHARD H. DINKINS, JUDGE