IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 19, 2022 Session

## MARK LEEDY v. HICKORY RIDGE, LLC

**Appeal from the Circuit Court for Sullivan County**
**No. C40986(C)      E.G. Moody, Judge**

———————————————

**No. E2022-00035-COA-R3-CV**

———————————————

This appeal concerns a breach of contract claim.  Mark Leedy ("Plaintiff") and Hickory Ridge, LLC ("Defendant") executed the Real Estate Land Installment Contract ("the Contract") under which Plaintiff would purchase real estate from Defendant located at 195 Derby Drive, Kingsport, Tennessee ("the Property").  Although Defendant accepted money from Plaintiff to be applied toward insurance, Defendant opted to "self-insure."  Sometime later, severe storms damaged the Property.  Defendant failed to properly assess or repair the damage.  Plaintiff spent another 18 months living on the Property all the while making payments before he left.  Plaintiff sued Defendant in the Circuit Court for Sullivan County ("the Trial Court") for breach of contract.  Defendant filed a counterclaim.  After a bench trial, the Trial Court ruled in favor of Plaintiff.  Defendant appeals, arguing, among other things, that Plaintiff assumed the risk of loss.[1]  We hold, *inter alia*, that Defendant was obliged to insure the Property pursuant to the Contract and associated documents.  However, we reverse the Trial Court's award to Plaintiff of attorney's fees and expenses as there is no provision in the Contract for such an award to Plaintiff.  Otherwise, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KRISTI M. DAVIS, J., joined.

Mark S. Dessauer, Kingsport, Tennessee, for the appellant, Hickory Ridge, LLC.

David N. Darnell, Kingsport, Tennessee, for the appellee, Mark Leedy.

---

[1] Plaintiff opted to rely solely on his brief and forego participation in oral argument.  Defendant appeared at and participated in oral argument.

## OPINION

## Background

In this breach of contract case, Plaintiff originally rented the Property from Defendant. Defendant later learned about a rebate, or credit, offered by the federal government for first-time home buyers. Defendant began using installment contracts as a means for first-time home buyers to receive this credit and buy homes in the neighborhood. In December 2009, Defendant, as seller, and Plaintiff, as buyer, entered into the Contract. The Contract contained these terms, among others:

> **2. Sale and Legal Description.** Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller the following described real estate in Sullivan County, Tennessee:
>
> > Lot 1 of Hickory Ridge Subdivision as shown on map of record in the Register's Office for Sullivan County at Blountville, Tennessee in Plat Book 49, Page 8. And being part of the property conveyed to Seller by deed recorded in the aforementioned Register's Office at Deed Book 2613C, page 721.
> >
> > This property has the address of 195 Derby Drive, Kingsport, Tennessee.
>
> **3. Price and Payments.** Buyer agrees to pay $76,853.00, which shall be financed by Seller based on a 30 year amortization at an annual interest rate of the Prime Rate as published by the Wall Street Journal plus 5%, which rate shall be adjusted as the Prime Rate changes. The interest rate as of the day of this Contract is 8.25%. Buyer agrees to make payments as set forth on the Payment Sheet attached to this Contract as Exhibit A.
>
> ***
>
> **8. Condition of Property "As Is."** Buyer accepts the property "As Is" in its present condition with any and all faults and acknowledges that Seller has made no representation or warranty concerning the physical condition of the property and assumes no liability therefor. Seller shall have no obligation for repairs or replacements, which shall be the sole responsibility and expense of Buyer. **Buyer hereby waives the residential**

**property disclosure required under Tennessee Code Annotated § 66-5-202.**

>    **9. Risk of Loss.** Buyer shall bear the risk of loss for destruction or condemnation of the property. Any such loss shall not relieve Buyer from any of Buyer's obligations pursuant to this contract.

***

>    **12. Default.** If the Buyer fails to observe or perform any term, covenant or condition of this Contract, including the failure to make any payment required under this Contract, Seller may take any or all of the following actions: (a) sue for any delinquent payment; (b) sue for specific performance of Buyer's obligations pursuant to this contract; (c) forfeit this Contract in which event the Buyer's rights under the Contract shall terminate, and all sums previously paid under the Contract shall belong to and be retained by the Seller, all improvements made to the property shall belong to Seller, and Buyer shall be required to surrender possession of the property and improvements to the Seller within ten (10) days after the notice of forfeiture is sent to Buyer by registered mail; or (d) sue to foreclose this contract as a mortgage under judicial foreclosure in which event Buyer may be liable for a deficiency.

>    **13. Attorneys' Fees and Costs.** In the event of any default hereunder by Buyer, Buyer agrees to pay reasonable attorneys' fees and other costs incurred by Seller.

(Bold type in original).

Exhibit A to the Contract set Plaintiff's monthly payment amount as $533.00 toward principal and interest; $18.00 toward taxes; and $60.00 toward insurance. The parties also entered into an agreement whereby Plaintiff would pay to Defendant as a down payment the entire amount of a tax refund he expected to receive. Defendant went on to receive $7,955.57, which was applied toward Plaintiff's principal obligation. Plaintiff also signed an Insurance Acknowledgment, which provided:

>    Buyer acknowledges that insurance included in Buyer's monthly payment insures only the real property and home located thereon and does not insure Buyer's personal property or contents or liability coverage. **Buyer should obtain insurance for Buyer's personal property and contents and liability coverage at Buyer's own separate expense.**

Buyer further acknowledges the receipt of an application for homeowner's insurance that will provide such coverage for personal property and contents and liability coverage. It is Buyer's responsibility to complete such application and, if Buyer is approved for such coverage, Seller will modify the payment amount accordingly to include such homeowner's insurance.

(Bold type in original).

In April 2011, thunderstorms swept through the Kingsport area. The Property was damaged in the storm, with damage done to the roof, vents, and siding. As it turned out, Defendant had elected to self-insure rather than obtain an insurance policy for the Property. Defendant undertook some repairs to the Property, such as fixing a window and putting some plastic wrap around the affected areas. Plaintiff was unsatisfied by Defendant's less than meager repair efforts. In January 2012, Plaintiff filed his first lawsuit against Defendant. Plaintiff left the Property in October 2012 and only then stopped making payments under the Contract. After taking possession of the Property, Defendant made the necessary repairs to the Property. In April 2015, Plaintiff filed another lawsuit—the current litigation—against Defendant in the Trial Court asserting various claims such as breach of contract, fraud, and violation of the Tennessee Consumer Protection Act. In August 2015, an agreed order was entered acknowledging dismissal of Plaintiff's claims except for his breach of contract claim against Defendant. For its part, Defendant filed an answer and counterclaim against Plaintiff. Defendant denied Plaintiff's allegations and asserted that Plaintiff defaulted on the Contract by abandoning the Property. Following a period of inactivity, the case was dismissed without prejudice in March 2018. In April 2018, upon Plaintiff's motion, the case was reinstated to the Trial Court's docket.

In August 2021, this case was tried without a jury. Daniel Victor Davis ("Davis"), Defendant's majority owner and managing partner, was the first witness to testify. Regarding Defendant's decision to self-insure, Davis stated:

Q. And you collected that $60 a month for, I don't know -- from at least February of 2010 through June of 2012, is that correct?
A. I don't have those records in front of me but I won't question that we did.
Q. Okay. What did you do with the money you got for the premium?
A. We put the money in the bank and we applied the payments to his mortgage.
Q. So you applied insurance payments to mortgage payments?
A. We did.
Q. All right.
A. We chose to self-insure the -- the properties.

Q. Okay. So when you say 'self-insure' you're saying that you didn't get paid a fee for doing the insurance, you just said we're going to insure them?
A. Exactly.
Q. Now,...
A. My dad came to me, and I don't remember exactly when, but he said that he had been thinking about it and that he felt like we could -- for the amount of money we were paying in premiums at the time that we could self-insure and come out ahead. Of course he didn't know we were going to have a tornado so it didn't work out the way we planned but we did make good on all the houses that got damaged.
Q. Well, that would make sense on what you said. So if -- if you and your father had this conversation at some point in time about these insurance proceeds that he could come out ahead, the reality of it is you would've collected insurance money and used it to pay the insurance premiums you all were paying unless you were self-insured, correct?
A. That's correct.

Davis testified that Plaintiff put a stop to repair work on the Property and insisted on the installation of a new roof. Davis did not recall ever telling Plaintiff before the storms came through about Defendant's decision to self-insure.

Second and last to testify was Plaintiff. Regarding damage to the Property, Plaintiff said that in "that one room that they plastic, it started mildewing and smelling and then I started getting water stain damages on my walls." With respect to the roof, Plaintiff said: "There was a couple of pieces missing, the shingles I'm referring to. And then there was hail damage all the way across it and it -- there was three air vents on top of the trailer. They was beat down, and two or three hundred little, about the size of a quarter where it had beat the shingles." Plaintiff testified further:

Q. All right. And what are you asking for from the Judge in this particular case as a result of their failure to make any of the -- the necessary repairs? What -- what are you asking for? What are you asking the Judge to award you here?
A. Just my money back because I felt like if they fixed everything that we showed them -- they let that place ruin with mold and mildew.
Q. Okay.
A. They ruined it.

***

Q. What was your understanding of -- of your insurance and what you were paying for it at the time you signed the contract?
A. By the contract -- that's what I was going by -- I thought I was paying $60 a month and I had insurance and nobody told me different.

On cross-examination, Plaintiff acknowledged that no one forced him to leave the Property. Plaintiff was then asked:

Q. Buyers shall bear the risk of loss for destruction or condemnation of the property. Do you see that, sir?
A. Uh-huh (affirmative).
Q. Doesn't that mean to you that you were responsible for the repairs...
A. That's why we get insurance. I can't afford repairs on nothing unless I have insurance.
Q. Okay. Well, let me ask you, did you spend any money -- after the storm and after the repairs you described, did you spend anything out of pocket to make repairs?
A. Probably not much. Probably caulk and stuff, you know.

Regarding Davis's testimony that Plaintiff put a stop to repair work, Plaintiff stated: "What I was trying to say was I want a roof, not a piece of shingle. I was wanting a roof. They didn't want to do the little squares, the roof. They wanted to put a little piece of shingle on there and say it's done." Plaintiff stated that he never paid for any repairs to the Property in relation to the storm damage.

In November 2021, the Trial Court entered its judgment and memorandum opinion. In its judgment, the Trial Court held that Plaintiff prevailed on his breach of contract claim; that Plaintiff was entitled to a judgment against Defendant in the amount of $15,755.57; that Plaintiff was entitled to an award of attorney's fees and expenses; and that Defendant's counterclaim was denied. In its detailed memorandum opinion, the Trial Court found as follows:

1. The Plaintiff and Defendant entered into a Real Estate Land Installment Contract ("the contract") on 12/29/2009 for the sale of a mobile home and lot located at 195 Derby Dr., Kingsport, Tennessee ("the Property") for the purchase price of $76,853.00 with an interest rate of 8.25% and a Balloon Payment due and owing on the 60th month.
2. The contract provided in paragraph 9 that the Risk of Loss was born by the Buyer for destruction or condemnation of the property. It also provided that any loss shall not relieve the Buyer from any of Buyer's obligations pursuant to the agreement. Exhibit A to the contract provides

-6-

that the buyer is to pay monthly payments of $611.00 beginning January 1, 2010 which included principal and interest of $533.00; estimated property taxes of $18.00; and estimated insurance of $60.00 per month.

3. Exhibit A to the contract also provides **"Buyer agrees to pay all property taxes and insurance for the property, which amount will be included in Buyer's monthly payment and will be forwarded to the taxing authority or insurance company by Seller prior to becoming delinquent."** It also provides that **"the payments for estimated insurance and property taxes are as hereinafter stated. Seller will adjust these payment amounts as needed to reflect an increase or decrease in cost."**

4. As part of the contract, a Down Payment Agreement was entered into on December 29, 2009 providing that Hickory Ridge, LLC would apply a portion of an expected tax refund totaling $7,685.30 to pay the first year of taxes and insurance on the property. The agreement lists the estimated costs of taxes at $216.00 annually and insurance of $720.00 annually.

5. Also included as part of the contract was a document entitled, "INSURANCE ACKNOWLEDGEMENT". The document provided that the insurance included in the Buyer's monthly payment insured only the real property and home and did not insure Buyer's personal property or contents or liability coverage. It states: "Buyer should obtain insurance for Buyer's personal property and contents and liability coverage at Buyer's own separate expense." The agreement further stated: "Buyer further acknowledges the receipt of an application of homeowners' insurance that provides coverage for personal property and contents and liability coverage. It is Buyer's responsibility to complete such application and, if Buyer is approved for such coverage, Seller will modify the payment amount accordingly to include such homeowner's insurance." The Seller did not present an application of insurance to the Buyer to insure personal property pursuant to this provision.

6. Mr. Leedy, prior to purchasing the property, rented the property from the Defendant and continued to remain on the property with his minor daughter after the contract was entered into.

7. The Plaintiff produced as **Exhibit 16** receipts for payments made toward the contract, totaling $25,993.57 from 2/2/2010 through 6/5/2012. In addition, the Defendant provided a statement of the account dated 10/31/2012 filed as **Exhibit 2** which shows additional payments were made by the Plaintiff from 7/9/2012 through 10/9/2012 totaling $2,520.00. In total the Plaintiff paid $28,513.57 toward the contract and his purchase of the property.

8. On or about April 27, 2011, a severe hail storm occurred in the Kingsport area causing significant property damage to the property as

follows: 1) damage to the vinyl siding located on the rear and left side of the mobile home; 2) damage to the roof shingles and roof vents; 3) denting of the rear guttering; 4) water leakage from the roof causing damage into the interior walls of the home; 5) the rear deck roof blew off; 6) a rear window was broken and 7) conduit damage on the rear of the home. All of the damages were documented by photographs.

9. Mr. Leedy learned, after the fact, that no insurance had been purchased by the Defendant to insure the property for damages as a result of a hail storm. The Defendant's representative, Vic Davis, testified that Hickory Ridge made the decision at some unknown time and for some unknown reason to self-insure the property but never disclosed it to Mr. Leedy.

Mr. Davis also testified that the $60.00 per month that Mr. Leedy paid for insurance was applied to the principle but it was not disclosed to Mr. Leedy either.

10. The effect of the contract was that Mr. Leedy was required to pay for insurance which primarily protected the seller as the legal owner and transferred all risk of loss to Mr. Leedy.

11. The Defendant's representatives made minor repairs to the property, including, replacing the broken window, removing the siding on the back wall and covering the back wall with house wrap sometime in May or June of 2011. No further repairs were ever made to the property by the Defendant, nor were any further measures taken to prevent further damage to the property before Mr. Leedy left.

12. On June 23, 2011, Vic Davis sent a letter to James H. Beeler, the former attorney for the Plaintiff, asking Mr. Leedy to request two (2) written estimates for repair of the roof and stating that the LLC would write a check once the work had been completed. The Plaintiff testified he got two estimates for roof repairs and gave them to a representative for Hickory Ridge but no repairs were made. Mr. Davis testified that he never received the estimates. There is no mention in the letter that any additional repairs would be made by Hickory Ridge to the property.

13. Vic Davis testified that a damage assessment was done on the property which listed damage to the siding on the back of the house, patio cover ripped off and a broken back window.

14. Plaintiff testified that no one ever came to inspect the interior of the home. Vic Davis testified he did not personally inspect the home.

15. Since no further repairs were being made to the property and since no assurance had been made that any further repairs were going to be made, the plaintiff filed suit against Hickory Ridge on January 31, 2012 for the failure of the Defendant to acquire insurance and seeking damages for the

damage occurring from the hail storm. The Defendant did not undertake to make any repairs or take any remedial measures after January 31, 2012 despite it being self-insured.

16. The Plaintiff vacated the property in October 2012 due to the condition of the property and failure to get any assurance by the Defendant that it was going to make additional repairs to the property. Mr. Leedy testified that he didn't have the funds or the ability to perform repairs; he testified he was concerned for the health of his minor daughter due to the water leakage and that he had high electric bills because there was no siding on the backside of the house. At the time the Plaintiff left the property, the back of the home was only covered with house wrap; the guttering was not repaired; the back porch roof was not replaced; the back door would not open all the way due to warping of the back porch roof; the roof had not been repaired or shingles replaced; the vents had not been replaced; and none of the water damage inside the home had been repaired or any remedial measures taken to prevent further leakage inside the home.

17. There was no evidence presented that the Defendant, or its agents, made any further efforts to make repairs to the property or take any remedial measures to secure the property prior to the time Leedy left the property in October 2012.

(Bold type in original, internal record citations omitted). The Trial Court then set out its conclusions of law, stating:

**Every contract contains the implied covenant of "good faith and fair dealing."**
Since Hickory Ridge decided to become self-insured, it created a conflict of interest with Mr. Leedy in regard to the repair of any damages since the payments had to come out of Hickory Ridge's pocket.

Since Hickory Ridge decided to become self-insured, it had the duty to have competent and experienced employees make correct assessments of the damages on behalf of Mr. Leedy who was an equitable owner and would have been a third-party beneficiary of the insurance he thought he had paid for. The assessment of the damages to Mr. Leedy's home by Hickory Ridge's employee was sorely lacking. It did not include damage to the roof or vents, damage to the vinyl siding on the side, damage to the interior caused by roof leaks, all of which was clearly shown by photographs, and uncontradicted testimony.

Damage cannot be repaired if it is not properly assessed.

The Court finds that the Defendant breached the contract by not providing insurance as agreed.

-9-

At the time that Mr. Leedy left the property, approximately eighteen months after the hail storm, the only repairs that had been made were a broken window replaced and house wrap put on the backside after the siding was removed. Mr. Leedy testified that he left because the repairs had not been made; that he was not told when, or if, they would be made and because he was afraid that the interior leaks would cause mold or mildew and harm his seven-year-old daughter. Hickory Ridge's defense was that materials were hard to get. Mr. Davis testified that he asked Mr. Leedy to obtain two estimates for the damage to the roof but he didn't receive them. Mr. Leedy testified he got the estimates and gave them to one of Hickory Ridge's employees. The Court finds Mr. Leedy's testimony to be credible.

Hickory Ridge had the sole authority and responsibility to make the repairs since it was the legal owner of the home and since it was self-insured.

It is important to note that, after Mr. Leedy moved out, Hickory Ridge made the necessary repairs and either rented or sold the home.

The Court finds that the Defendant breached the implied covenant of good faith and fair dealing by failing to properly assess the damages and by failing to make the necessary repairs in a reasonable time period.

As the result of Hickory Ridge's breach of contract, Mr. Leedy lost the government grant to first-time home buyers, which Mr. Davis had helped him to obtain, in the amount of $7,955.57. Mr. Leedy also lost the $2,400 he paid to have the front porch built on the house. In addition, Mr. Leedy and his daughter lived in the home for eighteen months with interior leaks and increased heating and cooling costs due to the lack of siding on the back side. Therefore, Mr. Leedy is entitled to an equitable adjustment on his monthly payments of $300 a month for eighteen months or $5,400.

The Court finds that the total of Mr. Leedy's damages is $15,755.57.

The Court finds that all of Mr. Leedy's damages were foreseeable by Hickory Ridge.

In addition, Mr. Leedy is entitled to his attorney fees pursuant to Section 13 of the contract.

(Bold type in original). In December 2021, the Trial Court entered an order granting Plaintiff an award of attorney's fees and expenses in the amount of $3,587.50. Defendant timely appealed to this Court.

### Discussion

We restate and consolidate Defendant's issues on appeal as follows: 1) whether the Trial Court erred in interpreting the Contract as requiring Defendant to insure the Property; 2) whether the Trial Court erred in determining that Defendant breached the Contract by

failing to assess damages and make necessary repairs to the Property; 3) whether the Trial Court erred in its computation of damages; 4) whether the Trial Court erred in granting Plaintiff an award of attorney's fees when the Contract has no provision for such an award to Plaintiff; and 5) whether Defendant should be awarded its attorney's fees incurred below and on appeal. Although not stated exactly as such, Plaintiff raises the following separate issues: 1) whether the Trial Court erred by not rescinding the Contract and 2) whether the Trial Court erred in its computation of damages by not deeming the Property a "total loss" for Plaintiff and computing damages based upon Plaintiff's full investment in the Property.

This matter was tried without a jury. Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). We defer to trial courts' assessments of witness credibility absent clear and convincing evidence to the contrary. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citations omitted). Clear and convincing evidence eliminates any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id*. at 692-93 (internal quotation marks omitted) (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)). To the extent that the issues on appeal implicate the abuse of discretion standard of review, "[a] court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Fisher v. Hargett*, 604 S.W.3d 381, 395 (Tenn. 2020) (internal quotation marks omitted) (quoting *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305-06 (Tenn. 2020)).

As a threshold question, we first address Plaintiff's issue of whether the Trial Court erred by not rescinding the Contract. Plaintiff asks that the Contract be rescinded on account of mutual mistake and that he be granted an award equaling all of the payments he made on the Property plus $2,500 for the front porch he built. Plaintiff asserts that the mutual mistake justifying rescission of the Contract "regard[s] insurance and the need for that insurance to address the risk of loss by [Plaintiff]."

Concerning rescission, this Court stated in *Klosterman Development Corporation v. Outlaw Aircraft Sales, Inc.*:

> Where parties have apparently entered into a contract evidenced by a writing, but owing to a mistake of their minds did not meet as to all the essential elements of the transaction, so that no real contract was made by them, then a court of

-11-

equity will interpose to rescind and cancel the apparent contract as written, and to restore the parties to their former positions, the rule being the same whether the instrument relates to an executory agreement or to one which has been executed. Furthermore, equity will grant relief on the ground of mistake, not only when the mistake is expressly proved, but also when it is implied from the nature of the transaction. It is not essential that either party should have been guilty of fraud.

[*Robinson v. Brooks*, 577 S.W.2d 207, 208 (Tenn. Ct. App. 1978)] (quoting 12 C.J.S. *Cancellation of Instruments* § 27 b(1)). The *Robinson* Court also provided the elements of mutual mistake necessary to authorize rescission:

> In order to authorize relief for mistake the mistake generally must have been mutual, and it must have been material, and not due to the complainant's negligence; and complainant must show injury.

*Id*. at 209 (quoting 17A C.J.S. *Contracts* § 418(2)).

*Klosterman Dev. Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 631-32 (Tenn. Ct. App. 2002). "The equitable remedy of rescission is not enforceable as a matter of right but is a matter resting in the sound discretion of the trial court and the court should exercise the discretion sparingly." *Id*. at 632 (citations omitted).

At trial in this matter, counsel for Plaintiff orally asked for the Contract to be rescinded. However, Defendant points out that in an agreed order entered earlier in this case, the parties agreed that Plaintiff's only remaining claim for trial was one for breach of contract against Defendant. The record contains this agreed order. We agree with Defendant that Plaintiff cannot now assert a theory of rescission when he agreed that the only remaining claim for trial was breach of contract. Nevertheless, even considering rescission, Plaintiff has failed to identify a genuine mutual mistake that would warrant rescission of the Contract. As found implicitly by the Trial Court, and as we find herein, there was no mutual mistake—Defendant simply failed to perform under the Contract. That alone is not a basis for rescission. The Trial Court did not err in declining to rescind the Contract.

We next address Defendant's issue of whether the Trial Court erred in interpreting the Contract as requiring Defendant to insure the Property. Regarding the interpretation of contracts, our Supreme Court has instructed:

When we interpret a contract, our role is to ascertain the intention of the parties. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). The intention of the parties is based on the ordinary meaning of the language contained within the four corners of the contract. *Kiser v. Wolfe*, 353 S.W.3d 741, 747 (Tenn. 2011); *see Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). The interpretation of a contract is a matter of law, which we review de novo with no presumption of correctness. *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006).

*84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011).

Defendant argues that (1) the Contract did not obligate Defendant to insure the Property and (2) the Contract did not obligate Defendant to assess or repair damage to the Property. Defendant contends that the Trial Court essentially read new terms into the Contract. For his part, Plaintiff points out that under the Contract, he paid $60 per month to be applied toward "insurance." The Insurance Acknowledgment executed with the signing of the Contract provided: "Buyer acknowledges that insurance included in Buyer's monthly payment insures only the real property and home located thereon and does not insure Buyer's personal property or contents or liability coverage." In his brief, Plaintiff poses the question: "Why have such a form signed by [Plaintiff], unless [Defendant] was supplying the insurance on the residence and not the personal property?" Indeed, Defendant has no satisfactory answer to that question. A plain and unforced reading of the Contract and Insurance Acknowledgment reveals that Defendant was obliged to insure the Property. Otherwise, the requirement that Plaintiff pay $60 per month to be applied toward insurance is utterly vitiated. Defendant argues that the Contract is an "as is" sale, but Plaintiff correctly points out that this was with respect to the condition of the Property at the time of purchase. The "as is" provision did not refer to the state of the Property following the storm damage nor did it somehow eliminate Defendant's obligation under the Contract to insure the Property. In short, Defendant could not accept $60 per month from Plaintiff for insurance and then successfully disclaim any obligation to insure the Property. We affirm the Trial Court in its conclusion that, under the Contract, Defendant was obliged to insure the Property.

We next address whether the Trial Court erred in determining that Defendant breached the Contract by failing to assess damages and make necessary repairs to the Property. As to the elements of a breach of contract claim, this Court has stated: "The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC Lifemed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (internal quotation marks omitted) (quoting *Custom Built Homes v. G.S. Hinsen Co., Inc.*, No. 01A01-9511-CV-00513, 1998 WL

-13-

960287, at *3 (Tenn. Ct. App. Feb. 6, 1998), *no appl. perm. appeal filed*). "Whether a party has fulfilled its obligations under a contract or is in breach of the contract is a question of fact." *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 225 (Tenn. Ct. App. 2009) (citing *Carter v. Krueger*, 916 S.W.2d 932, 934-35 (Tenn. Ct. App. 1995)).

Defendant disputes that it had an obligation to assess or repair damage stemming from any interest Plaintiff had in the Property. Defendant asserts further that Plaintiff failed to prove he incurred any damages stemming from an alleged breach. In addition, Defendant argues that the Trial Court erred in concluding that Defendant breached the covenant of good faith and fair dealing by failing to properly assess or repair damages within a reasonable time. We already have addressed Defendant's first point and found it unavailing; Defendant was obliged to insure the Property. As to Defendant's point regarding a breach of the covenant of good faith and fair dealing, we consider this subsumed into Defendant's argument regarding breach and the existence of damages generally.

As to whether any damages were proven, the evidence shows that Plaintiff was reduced to living in a moldy and mildew-ridden home because of Defendant's failure to repair the Property; those conditions constitute the damages in this case. Defendant took payments from Plaintiff toward "insurance." Concurrently, Defendant undertook to "self-insure" the Property. Defendant was required, just as an insurance company would have been, to properly assess and repair damage to the Property. The Trial Court made its findings with respect to Defendant's inadequate repairs of the Property. The Trial Court found that Defendant "made minor repairs to the property, including, replacing the broken window, removing the siding on the back wall and covering the back wall with house wrap sometime in May or June of 2011." This was wholly inadequate and constituted a breach of the Contract. While Defendant contends that Plaintiff "abandoned" the Property, Plaintiff was not required to continue performing under the Contract when Defendant's initial failure to fulfill its contractual obligations left the Property unsuitable for human habitation resulting in a material breach by Defendant. The evidence does not preponderate against the Trial Court's factual findings relative to this issue, nor is there clear and convincing evidence in this record that would serve to overturn the Trial Court's credibility assessments. We affirm the Trial Court in its determination that Defendant breached the Contract by failing to assess damages and make necessary repairs to the Property. We also affirm the Trial Court's denial of Defendant's counterclaim. Consequently, as to Defendant's issue regarding attorney's fees, there are no grounds upon which to award Defendant attorney's fees, whether they were incurred below or on appeal. We decline to award Defendant any attorney's fees.

We next address whether the Trial Court erred in its computation of damages. Both parties challenge the Trial Court's ruling with respect to damages—Defendant contends

the damages found are too much, while Plaintiff contends they are too little.  We address both Plaintiff's and Defendant's arguments under the umbrella of this issue, which requires us to examine both the measure of damages and the amount of damages ultimately found by the Trial Court.  This Court has explained:

> In a breach of contract action, damages resulting from the breach are a necessary element of the claim and, therefore, the claimant has the burden of proving damages at trial.  *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011); *ARC Life–Med, Inc. v. AMC–Tenn, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).  On appeal, the appellant has the burden of showing the evidence presented at trial preponderates against the trial court's findings of fact.  *BancorpSouth Bank v. Hatchel*, 223 S.W.3d 223, 229 (Tenn. Ct. App. 2006) (citing *Dunlop Tire & Rubber Corp. v. Serv. Merch. Co.*, 667 S.W.2d 754, 758 (Tenn. Ct. App. 1983) (further citation omitted)).

### A. Measure of Damages

The choice of the proper measure of damages is a question of law to be decided by the court.  *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998).  Accordingly, when we review a trial court's selection of a damages measure, our review is *de novo* with no presumption of correctness.  *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 537 (Tenn. Ct. App. 2000).

The purpose of assessing damages in a breach of contract action is to make the non-breaching party whole, to place the non-breaching party "in the same position he would have been in had the contract been performed.["]  *Hiller v. Hailey*, 915 S.W.2d 800, 805 (Tenn. Ct. App. 1995).  Therefore, herein the damages appropriately awarded by the trial court should have been designed to place Ms. Buttrey in the position she would have been in had the contract been performed as contemplated.  *BancorpSouth Bank*, 223 S.W.3d at 228; *GSB Contractors v. Hess*, 179 S.W.3d at 538; *Wilhite v. Brownsville Concrete Co., Inc.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990); *Edenfield v. Woodland Manor*, 462 S.W.2d 237, 241 (Tenn. Ct. App. 1970).

***

So long as the amount of damages awarded is within limits justified by the law, the amount awarded is a question of fact and is reviewed like other questions of fact.  *Memphis Light, Gas & Water Div. v. Starkey*, 244 S.W.3d 344, 352-53 (Tenn. Ct. App. 2007); *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 229.  That is because "[d]eterminations concerning the

amount of damages are factually driven." *Beaty v. McGraw*, 15 S.W.3d at 827 (citing *Loftis v. Finch*, 491 S.W.2d 370, 377 (Tenn. Ct. App. 1972)).

*Buttrey v. Holloway's, Inc.*, No. M2011-01335-COA-R3-CV, 2012 WL 6451802, at *7, *10 (Tenn. Ct. App. Dec. 12, 2012), *no appl. perm. appeal filed*.

Defendant argues, to wit: that the Trial Court's award to Plaintiff of the $7,955.57 rebate amounted to a refund of a portion of the purchase price which was never contemplated by the Contract; that the Trial Court's award to Plaintiff of $2,400 for the front porch likewise never was contemplated by the Contract; and that the Trial Court's reduction of $300.00 from Plaintiff's monthly payments for a period of 18 months violates the parol evidence rule as such a reduction was not provided for by the Contract.

Meanwhile, Plaintiff argues that he suffered a "total loss." Plaintiff asserts that he should be awarded $30,401.57, representing the payments he made plus $2,500 for the front porch less $612.00 withheld for property taxes. Plaintiff cites, among other cases, *King v. Dunlap*, 945 S.W.2d 736, 744 (Tenn. Ct. App. 1996) for the proposition that if insurance proceeds are paid, the seller holds the proceeds as trustee for the buyer. In another case along these lines cited by Plaintiff, this Court discussed the following scenario:

> In this case, the contract provided that Buyer was to maintain insurance, confirming the risk of loss would fall on her. The parties agreed, as their course of conduct shows, that Buyer would reimburse Seller for insurance premiums. Thus, the continued acceptance of the reimbursement of payment for the insurance premiums supports the trial court's conclusion that the parties agreed Seller would maintain the policy and Buyer would pay the premiums. Therefore, any proceeds from the policy were held in trust by Seller for Buyer's benefit, and may, in the first instance be applied to the remaining balance owed to Seller under the contract. Any excess belongs to Buyer, absent other obligations owed to Seller by Buyer. If the insurance proceeds pay off the balance of the loan, the Buyer is entitled to conveyance of the real property under the contract.

*Martin v. Coleman*, No. M1999-02238-COA-R3-CV, 2001 WL 673701, at *5 (Tenn. Ct. App. June 18, 2001), *no appl. perm. appeal filed*. "Tennessee is one of the jurisdictions which follows the equitable rule 'that where the building which was the subject of conveyance is destroyed or damaged, the vendor must apply the proceeds upon the purchase price and account for the balance to the purchaser.'" *Id*. (quoting *Hillard v. Franklin*, 41 S.W.3d 106, 115 (Tenn. Ct. App. 2000)) (other citations omitted).

Each of Defendant's points relative to this issue stem from its fundamental position that, under the Contract, Plaintiff bore the risk of loss. However, while Plaintiff may have borne the risk of loss, this was subject to Defendant's obligation under the Contract to insure the Property. Here, Defendant elected to self-insure. Defendant then failed to fulfill its obligations as a purported self-insurer, which resulted in damages to Plaintiff. With respect to Plaintiff's argument, we disagree with Plaintiff that he suffered a "total loss." Plaintiff lived at the Property for some two years or more before the 2011 storms hit. He continued to live at the Property for another 18 months thereafter. He clearly obtained at least part of his expected benefit under the Contract. To grant Plaintiff the award he seeks would be akin to granting him a windfall; it would not restore him to the position he would be in but for Defendant's breach of the Contract. The cases Plaintiff points to are instructive but, in the end, inapposite. There are no insurance proceeds to be had in this case. The Trial Court did the best it could to compute damages under the unusual facts of this case and Defendant's purported self-insurance. Specifically, the Trial Court attempted to put Plaintiff in the position that he would have been in but for Defendant's failure to perform under the Contract. Upon our *de novo* review, we affirm the Trial Court in its choice as to the measure of damages. With respect to the amount of damages awarded to Plaintiff, we find that the evidence does not preponderate against the Trial Court's findings. We affirm the Trial Court in its computation of damages.

The final issue we address is whether the Trial Court erred in granting Plaintiff an award of attorney's fees when the Contract has no provision for such an award to Plaintiff. On this issue, we are guided by the American Rule. In *Cracker Barrel Old Country Store, Inc. v. Epperson*, our Supreme Court explained the American Rule thusly:

> Tennessee, like most jurisdictions, adheres to the "American rule" for award of attorney fees. *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998); *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985). Under the American rule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case. *Taylor* [*v. Fezell*], 158 S.W.3d [352,] 359 [(Tenn. 2005)]; *John Kohl*, 977 S.W.2d at 534.

*Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (footnote omitted). Generally, a trial court's award or denial of attorney's fees is reviewed under the abuse of discretion standard. *Hunt-Carden v. Carden*, No. E2018-00175-COA-R3-CV, 2020 WL 1026263, at *5 (Tenn. Ct. App. Mar. 3, 2020), *no appl. perm. appeal filed*.

Defendant points out that Section 13 of the Contract provides for an award of attorney's fees only to the seller, Defendant, and not the buyer, Plaintiff. In response, Plaintiff argues that this provision is unconscionable, and Section 13 should be read to apply to both Defendant and Plaintiff. However, Plaintiff asks us to read a provision into the Contract which simply is not there. There is no provision in the Contract for recovery of attorney's fees by the buyer. What is more, even if Section 13 of the Contract were unconscionable, Defendant is not receiving an award of attorney's fees. The result of our Opinion for purposes of attorney's fees is the same result reached under a plain application of the American Rule—that is, Plaintiff pays his own attorney's fees as there is no contractual or statutory provision to the contrary.

Generally, an award of attorney's fees is within a trial court's discretion, and such awards are reviewed under the deferential abuse of discretion standard. Nevertheless, even accounting for a trial court's discretion in these matters, there simply is no provision in the Contract for an award of attorney's fees to Plaintiff. Absent circumstances not present here, courts are to give effect only to those provisions contained within the four corners of a contract. With no exception to the American Rule having been established, the Trial Court applied an incorrect legal standard and thereby erred in granting an award to Plaintiff of his attorney's fees and expenses. We, therefore, reverse the Trial Court in its grant of an award to Plaintiff of his attorney's fees and expenses. Otherwise, we affirm the judgment of the Trial Court.

### Conclusion

We reverse the Trial Court's grant of an award to Plaintiff of his attorney's fees and expenses. Otherwise, we affirm the judgment of the Trial Court. The judgment of the Trial Court is thus affirmed, in part, and reversed, in part. This cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half against the Appellant, Hickory Ridge, LLC, and its surety, if any, and one-half against the Appellee, Mark Leedy.

_____
D. MICHAEL SWINEY, CHIEF JUDGE